THE MARINE BANK OF CHICAGO, Appellant, *v.* WILLIAM B. OGDEN *et al.*, who sue for the use of Darlington & Townsend, Appellees.

APPEAL FROM THE SUPERIOR COURT OF CHICAGO.

A check upon a bank will draw the kind of funds deposited anterior to its date, although an agreement between the depositor and the bank to receive other funds may have been subsequently made.

As a general rule, corporations are not capable of forming a partnership; but they may make joint contracts by which both bodies may become liable.

One bank may employ another as its agent.

THIS was an action of assumpsit, brought by William B. Ogden, Mahlon D. Ogden, Edwin H. Sheldon, and Stanley H. Fleetwood, partners, transacting business under the name of Ogden, Fleetwood & Co., against the appellant, in the Superior Court of Chicago. The declaration contains only the common money counts. The plea is the general issue.

The material facts in the case are, that the defendant is a banking institution, organized under the general banking laws of the State in the year 1852. The Chicago Marine and Fire Insurance Company is a corporation, created by an act of the legislature, approved January 13, 1836. The act is a public one, and authorizes the corporation to receive deposits, buy and sell exchange, and loan money at any rate of interest not exceeding twelve per cent. per annum. The corporation commenced transacting a banking business as early as 1846 or 1847.

The stockholders of the two corporations were the same persons. The stockholders of the Chicago Marine and Fire Insurance Company had, each of them, a corresponding number of shares of the stock of the Marine Bank. These institutions issued to their stockholders joint stock certificates, stating the number of shares owned by the stockholders respectively in each of them. There was nothing requiring the stockholders to hold the same number of shares of stock in each institution, but there was a resolution of the board of directors of each corporation requesting the stockholders to hold or transfer their stock in that manner.

The officers of the insurance company were nine directors, a president, vice president, acting vice president, secretary, and assistant secretary. The officers of the Marine Bank were nine directors, a president, vice president, acting vice president, cashier, and assistant cashier. The same persons filling the respective offices in the one institution, filled the corresponding offices in the other. Among the employees of the insurance company were book-keepers, receiving and paying tellers, and other clerks. A book-keeper was the only employee of the Marine Bank. It had no receiving or paying teller. The business of the two institutions was transacted in the same building and in the same room. The building is situated on the corner of Lake and La Salle streets, Chicago. On the Lake street front is inscribed on the stone wall the words, "Marine Bank," and on La Salle street there is a a sign of "The Chicago Marine and Fire Insurance Company."

17

The insurance company received deposits, loaned money and transacted a general banking business, but it did not issue any notes or other evidence of indebtedness for circulation as money. The Marine Bank was authorized by law to issue bank bills to the amount of fifty thousand dollars, and it had in circulation a small portion of that amount. It received deposits from the United States Circuit and District Courts, and from the sewerage commissioners of Chicago, but from no others. The law requires said courts and sewerage commissioners to make their deposits with a bank. It transacted a collection and exchange business, and for that purpose kept accounts with the Park Bank and the Metropolitan Bank, of New York, and the Wisconsin State Bank. It loaned money to the insurance company, but none to other parties. It uniformly declined to receive money on deposit, except from said courts and sewerage commissioners, and to transact any business other than a collection and exchange business, except such as arose from receiving and returning the deposits before mentioned. It was never any part of the business of the bank to receive or keep deposits, except in the instances mentioned. Each institution kept a separate set of books, in which its transactions were entered. All moneys paid to, or deposited with the Marine Bank, were received by the officers or employees of the insurance company, and mixed with its other funds, and were credited by the insurance company upon its books to the bank in account. They were also charged by the bank upon its books to the insurance company. All moneys paid out by the bank, upon checks or otherwise, were paid by the officers or employees of the insurance company from its funds, and were charged by the insurance company upon its books to the bank. They were also credited by the bank upon its books to the insurance company. The insurance company received money of the bank, and it was charged to the insurance company upon the books of the bank, and credited to the bank upon the books of the insurance company. The bank received money of the insurance company, and it was charged to the bank upon the books of the insurance company, and credited to the insurance company upon the books of the bank.

Thus the two institutions were kept separate and distinct from each other, although the money in the common vault of both parties, was the property of the insurance company. The bank had no money in the vault, unless it was some specially set apart for a particular purpose. It appeared in evidence that the profits made by the bank in buying and selling exchange, and the profits made by the insurance company in loaning money, were divided between the two institutions, but each institution declared a separate dividend to its stockholders.

Upon the trial in the court below, the plaintiffs read in evidence the following advertisement in the *Chicago Tribune*, dated September 10, 1855 :

MARINE BANK OF CHICAGO.
CHICAGO MARINE AND FIRE INSURANCE COMPANY.

CHICAGO, ILLINOIS, Sept. 10, 1855.

The capital stock of this institution has been increased to $500,000. Its business is exclusively confined to legitimate moneyed transactions, taking no risks, either fire or marine.

Collections and remittances are made by it on as favorable terms as by any other responsible bank or house in Chicago.

Its directors are,

| | |
|---|---|
| J. Young Scammon, | Mark Skinner, |
| Hugh T. Dickey, | John P. Chapin, |
| Geo. W. Dole, | Benj. W. Raymond, |
| Buckner S. Morris, | Franklin Scammon, |

Benjamin F. Carver.

J. YOUNG SCAMMON, *President.*

BENJAMIN F. CARVER, *Cashier and Secretary.*

The plaintiffs also read in evidence the following advertisement in the same paper, dated October 24, 1860 :

MARINE BANK.
CHICAGO MARINE AND FIRE INSURANCE CO.
CAPITAL, $500,000.

J. YOUNG SCAMMON, *President.*

B. F. CARVER, *Cashier and Secretary.*

☞ Collections made and drafts remitted to all parts of the Union.

The plaintiffs also read in evidence the following advertisement in the same paper, dated March 16, 1861, and May 8, 1861 :

MARINE BANK.
CHICAGO MARINE AND FIRE INSURANCE CO.
CAPITAL, $500,000.

J. YOUNG SCAMMON, *President.*

HAMILTON B. DOX, *Cashier and Secretary.*

☞ Collections made and drafts remitted to all parts of the Union.

It was admitted that defendant took said paper at said respective dates, and paid for the publication of said advertisements therein.

It also appeared on the trial that the two institutions used printed letter headings in their correspondence, and that those generally used were headed only with the name of the institution using them; but in some instances they had used such letter headings with the names of both institutions upon them.

The plaintiffs also read in evidence the following joint circular, issued by both institutions:

THE MARINE BANK OF CHICAGO.
CHICAGO MARINE AND FIRE INSURANCE COMPANY.

CHICAGO, Illinois, Nov. 1, 1860.

Hamilton B. Dox, Esquire, has been appointed cashier and secretary of these institutions, in place of B. F. Carver, Esquire, resigned.

All drafts, certificates of deposit, or other documents creating a liability against either of the above named institutions, will, as heretofore, bear the signatures of two of the undersigned, this being a by-law of these institutions.

Correspondents are requested to address their letters on the outside, or upon the envelopes, to "The Marine Bank of Chicago," and not to the individual names of its officers. We annex our signatures.

Very respectfully,
Your ob't servants,

| | | | |
|---|---|---|---|
| Signature of J. Young Scammon. | | J. YOUNG SCAMMON, | |
| | | | *President.* |
| " | " | Hugh T. Dickey. | HUGH T. DICKEY, |
| | | | *Vice President.* |
| " | " | H. G. Loomis. | HORATIO G. LOOMIS, |
| | | | *Asst. Vice President.* |
| " | " | Ham. B. Dox. | HAMILTON B. DOX, |
| | | | *Cashier and Secretary.* |
| " | " | Saml. S. Rogers. | SAMUEL S. ROGERS, |
| | | | *Asst. Cashier and Asst. Sec'y.* |

The plaintiffs called *William F. Fleetwood,* who testified that he was the cashier of the plaintiffs, and that he did not

know of any difference between the insurance company and the bank; and that he believed they were one institution.

The plaintiffs also called *Franklin Hathaway*, who testified that he was the cashier of William B. Ogden, and that he did not know the relations between the bank and the insurance company; he had never been told that there was any difference between them. In 1858, Mr. Ogden, through the witness, opened a deposit account with the insurance company. At that time, the teller handed the witness a bank book, with the words " Chicago Marine and Fire Insurance Company " inscribed thereon in letters, and a book of blank checks to use, in the following form:

No. ........            MARINE BANK:
          CHICAGO MARINE AND FIRE INSURANCE CO.,
*Pay* ...................................................... *or Bearer*,
..................................................... *Dollars*,
*in Currency.*
   $........                ...............................

and upon such checks the witness drew all of Mr. Ogden's money from the insurance company. But it appeared that the above form of check was not the usual one given out for use, by the insurance company or the bank, since November 1, 1860.

The purpose for which these advertisements, letter headings, circulars, blank checks, and the testimony of Fleetwood and Hathaway, were introduced in evidence, was, to show the manner in which the two institutions held themselves out to the world in the transaction of their business. But it appeared from the testimony of *Mahlon D. Ogden*, one of the plaintiffs, that he *actually knew* that the insurance company and the bank were two separate institutions. He also knew that the insurance company was organized many years ago, under an old charter, and that the bank was organized under the free banking law as a separate concern. He further knew when his firm was keeping the account, the balance of which is the subject of the controversy in this suit, *that the account was kept with the insurance company*.

The plaintiffs opened a deposit account with the insurance

company as early as March, 1856, and it was continued until May 17, 1861. It appeared that the plaintiffs had been in the habit of depositing gold as such, and currency as such; that all deposits not specifically entered as gold or specie were in currency. That the plaintiffs frequently had gold or specie converted into currency, and obtained a credit for the difference between the two. The plaintiffs' checks were always paid in currency, unless they specified upon their face that they were to be paid in gold; and then the plaintiffs were charged with the difference between gold and currency, if they had not sufficient gold on deposit to pay the check. From the time the account was first opened, the parties transacted their business in that manner.

On the 20th day of April, 1861, the agent of Messrs. Darlington & Townsend deposited with the plaintiffs a draft drawn by the Kane County Bank, upon F. Granger Adams, for eleven hundred and fifty dollars. On the same day the plaintiffs deposited this draft and one hundred dollars in currency, with the insurance company, and received a credit upon their bank book for twelve hundred and fifty dollars in currency. The draft was duly paid. On the 22nd day of April, 1861, the plaintiffs drew a check upon the insurance company, dated April 20, 1861, for $1,150, payable to G. F. Bailey or order, the agent of Messrs. Darlington & Townsend, who took it for the deposit made with the plaintiffs before mentioned. The plaintiffs always had on deposit more funds than were necessary to pay the check, but in July and September, 1861, they drew out all their funds except $1,650, leaving that sum to pay the check in question and another check of $500 similarly situated, which has since been paid. The check in question was not presented until the 6th day of June, 1861, when a demand of its payment was made upon the teller of the insurance company and of the bank. The teller offered to pay it in Illinois bank bills, then estimated to be worth in market fifty to sixty cents on the dollar, but such as were current on the 29th day of April, 1861, when the plaintiffs signed the agreement which will be presently mentioned.

It appeared in evidence, that from April 1, 1861, to May 18, 1861, Illinois currency consisted exclusively of bills issued by Illinois banks organized under the general banking law. The issues of these banks were generally made by irresponsible bankers. They were based on a pledge of public stocks with the auditor of the State. In November, 1860, the bills issued by Illinois banks commenced depreciating, and in the same month those of nine banks were discredited and no longer circulated as currency. On the 31st day of March, 1861, the bills issued by thirty more of the banks were discredited and no longer circulated as currency. The bills. issued by the remaining banks, amounting to $6,500,000, continued to pass as currency, until the 18th day of May, 1861, when they were so far depreciated that they were also discredited and ceased to pass as currency. The bills of these banks, not including those discredited in November, 1860, and March, 1861, were worth, in June, 1861, from sixty-five to seventy cents on the dollar, according to the value of the stocks deposited for their security. The insurance company had $60,000 of the bills discredited in November, 1860, and $170,000 of those discredited March 31, 1861.

On the 29th day of April, 1861, the insurance company refused to do business with any of its customers unless they would sign the following agreement. The plaintiffs' cashier, having first procured authority so to do from Mahlon D. Ogden, one of the plaintiffs, signed the agreement for the plaintiffs, and the due execution of it by the other parties thereto was admitted. The agreement is as follows:

We, the undersigned, citizens and business men of Chicago, agree to receive and pay out as currency, in payment of debts, and general transactions of business, during the present war, the notes of all the banks of this State at present taken by the following named banks and bankers of this city, provided the bankers named below agree to do the same:

Chicago Marine and Fire Insurance Company, Western Marine and Fire Insurance Company, B. F. Carver & Co., Hoffman & Gelpcke, F. Granger Adams, E. I. Tinkham & Co., H. A. Tucker & Co.

OGDEN, FLEETWOOD & CO.
Per W. F. FLEETWOOD, *Cash.*

Marine Bank of Chicago *v.* Ogden *et al.*

CHICAGO, April 26th, 1861.

We, the undersigned, citizens and business men of Chicago, agree to receive and pay out as currency, in payment of debts, and general transactions of business, during the present war, the notes of all the banks of this State at present taken by the following named banks and bankers of this city, provided the bankers named below agree to do the same:

Chicago Marine and Fire Insurance Company, Western Marine and Fire Insurance Company, B. F. Carver & Co., Hoffman & Gelpcke, F. Granger Adams, Edward I. Tinkham & Co., H. A. Tucker & Co.

In accordance with the above, we, the undersigned bankers, do hereby ratify and confirm the agreement therein expressed.

| | |
|---|---|
| J. YOUNG SCAMMON, | B. F. CARVER & CO. |
| *Pres. C. M. & F. I. Co.* | HOFFMAN & GELPCKE. |
| H. A. TUCKER & CO. | EDW'D I. TINKHAM & CO. |
| F. G. ADAMS. | J. H. WOODWORTH, *Pt.* |

It appeared in evidence that the uniform custom of banks in Chicago was to keep separate accounts of specie, Eastern funds and currency deposited. If a depositor had specie or Eastern funds on deposit, he had a right to draw for like funds; but if his deposit was of currency, he could draw for nothing but currency. On the 20th day of April, 1861, Illinois bank notes were worth from eighty-five to ninety cents on the dollar in specie. On the 11th day of May, 1861, the teller of the insurance company pasted upon the plaintiffs' bank book the following printed label:

CHICAGO MARINE AND FIRE INSURANCE CO.

This institution receives the bills of Illinois banks on deposit only on the condition that it shall have the privilege of paying its depositors in the same bank bills which are received and paid out by this institution.

This label was pasted upon the plaintiffs' bank book in the presence of the plaintiffs' cashier, and although his consent was not asked, neither he nor the plaintiffs, then or at any time afterwards, objected thereto. After that time the plaintiffs deposited $2,336.84, which was entered in the same book. All of the banking institutions who signed the agreement received the bills of Illinois banks after May 18, 1861, in payment of debts due them respectively, but not for other purposes.

The court below instructed the jury, substantially, that the insurance company and the bank were separate and distinct

corporations, and that the bank could not be held liable, or charged in the suit, as a partner of the insurance company; but the jury might find from the evidence, that the relation of principal and agent existed between the two institutions, and hold the bank liable as principal. The court assumed that the deposits were to be returned in money, at the numeric value of the bills deposited, and instructed the jury that such would be the measure of damages, if the defendant and the insurance company refused to receive Illinois bank notes as currency in general business transactions after the 18th day of May, 1861. Under these instructions, and some others upon minor points, which will be noticed hereafter, the jury returned a verdict for the plaintiffs, $1,197.16. The defendant moved for a new trial, which motion was overruled, and judgment rendered on the verdict. The defendant appealed, and brings the case to this court.

C. BECKWITH, for Appellant, with whom were T. HOYNE, and FULLER & McCAGG.

The only power that one partner has to bind his copartner arises from the fact that the one is the agent of the other. The legal capacity of the two institutions to sustain that relation to each other comes in question, in whatever form it is attempted to be established. The two institutions are distinct and separate corporations, created and organized under different laws. Each corporation has distinct and separate powers, committed to a distinct board of managing officers, who are alone authorized to exercise them. Each corporation has distinct and separate duties to perform, which are to be discharged by their respective boards of managing officers. The stockholders at large have no direct powers or duties in regard to the public, but are represented in that respect by the managing officers, who are their trustees.

The law defines the extent of the powers of every corporation, and declares that to such extent its managing officers may go, and no further. The limit thus placed upon the powers of the trustees is one which they cannot legally exceed; and all acts of such trustees, beyond the powers conferred

upon them, are, like the acts of all other trustees, when acting beyond the scope of their authority, not binding upon their *cestuis que trust.* The rights and liabilities of stockholders are not prejudiced by unauthorized acts of managing officers, and the imperative necessity of maintaining the rights of stockholders has always induced a firm adherence to the principle. The managing officers are also trustees of the public. The powers to be exercised and the duties to be performed are for the public benefit, and the public have an interest that those powers shall not be exceeded, and that the duties shall be performed as the law requires. The law declares that the powers of the bank and those of the insurance company shall be exercised by their respective boards of directors severally, and not jointly with the managing officers of another corporation. And all agreements between the managing officers of the two corporations to exercise the powers, thus severally vested in them, jointly, or for the joint benefit of the two corporations, are beyond the powers of the managing officers, and void. Such agreements are against the policy of the law, and cannot be legally entered into by two corporations. 21 How. 442.

The appellee seeks to charge the bank as a partner of the insurance company, from the fact that the profits made by it in loaning money were divided between the two institutions. But the trustees of the bank had no power to enter into any agreement by which it expressly or impliedly became a partner of the insurance company. Neither the stockholders of the bank, nor the public, ever authorized the trustees to make any such agreement, and as to them, the alleged agreement must be treated as a nullity. The relation that would be thereby created would require the exercise of the powers of the two corporations jointly, and for a joint purpose, which the law forbids. The insurance company has, in some respects, more enlarged powers than the bank, and the stockholders of the bank, as such, cannot legally derive any benefit from the exercise of the powers of the insurance company. The insurance company is authorized to take twelve per cent. interest, while the bank is forbidden to take more

than ten per cent. The trustees of the bank cannot enter into a copartnership, and thereby do indirectly that which it is expressly forbidden to do. Extraordinary liabilities are imposed upon the stockholders of the bank, and these cannot be enlarged by an agreement not authorized by them, nor can they be evaded or diminished by an agreement not authorized by the law. The trustees of the insurance company, in like manner, have no power to bind its stockholders by an agreement not authorized by them. Neither board of trustees can bind its stockholders, except in the manner authorized by law. The trustees of each corporation are required to act separately, and an attempt to act jointly as partners would create no joint or separate liability against the stockholders of the two institutions. The law has given to banks the power to act jointly in a single instance, and thus impliedly taken from them the power to act in that manner in all others. Laws of 1861, title Banks, art. 2, sec. 6.

The bank is expressly prohibited from receiving any interest, compensation or benefit whatever, from any loan made by any other person or party, whether such loan be made from its own funds or otherwise. Laws of 1861, title Banks, art. 4, sec. 5.

It must be conceded that the statute expressly forbids all agreements, of every kind, name, and nature, that would place the funds of the bank under the control of any persons other than its legitimate officers, and all such agreements must be held to be beyond the powers of its managing officers, and void as to stockholders.

The law charges every person dealing with the managing officers of a corporation, whose powers are limited and defined by public acts of the legislature, with knowledge of the extent of the powers of such officers. No one is at liberty to assert that he has been misled in that respect. The plaintiffs cannot be heard to claim that they supposed the two institutions were one and the same, because the law charges them with knowledge that they were separate and distinct corporations, with separate and distinct powers and duties. Neither can the plaintiffs be heard to claim that they supposed that the

two institutions were liable to them as partners, because the law charges them with knowledge that the two institutions could not incur any such liability. 21 Howard, 442.

The manner in which the two institutions held themselves out to the world in the transaction of their business, is not material, as no one could be legally misled thereby. The advertisements, letter headings, circulars, etc., introduced in evidence, were not calculated to mislead any one. They clearly show that there were two institutions. There is no intimation that the business to be transacted by them respectively, was to be done in the joint names of the two institutions or for their joint benefit. There is no intimation that the two institutions intended to incur any joint obligation. No one was in fact deceived. The plaintiffs actually knew that the two institutions were separate and distinct. They actually knew under what law each institution was organized, and that the one was doing business before the other had an existence. The plaintiffs actually knew that they were transacting business with the insurance company, and with it alone. They never supposed that the two institutions were one and the same, and they never supposed that they were transacting business with the two institutions jointly. They had no suspicion even of a joint liability of the two institutions as partners, or otherwise. They relied solely upon the responsibility of the insurance company. Under these circumstances it is not necessary further to consider the manner in which the business of the two institutions was transacted.

The plaintiffs being discharged from liability upon the check drawn by them and delivered to Messrs. Darlington & Townsend, these persons now seek in the name of the plaintiffs, and for their use, to charge the bank as a partner of the insurance company. It is incumbent on them to show that the bank, by virtue of some agreement, legally sustained that relation. The plaintiffs' claim in this respect is by force of the agreement, and to establish it they must show an agreement legally binding upon the stockholders of the two institutions, and which, in its effect, makes the one corporation a partner of the other. An agreement which the trustees of the respec-

tive corporations had no power to make, and which binds neither of them, cannot create any legal relation. It is an essential requisite of every agreement that the parties have power to contract, and where there is no such power, the so-called agreement is treated by courts as a nullity, and cannot be enforced for any purpose whatever. An agreement that confers no rights and imposes no duties upon the respective parties, cannot be made the foundation of a legal obligation.

The fact that the bank received money of the insurance company, does not establish a partnership relation between them; neither does the fact that the amount thus received was a certain portion of the profits of the latter, have that effect. A right under and by virtue of some valid agreement to receive a portion of the profits, is necessary to constitute a partnership; and where the right exists, it is immaterial whether the party has ever received anything under it or not. The mere fact of a participation in profits and losses does not necessarily constitute a partnership. The party sought to be charged as a partner must not only have a right to a share of the profits, but he must have a specific interest in the property of the alleged partnership or in its business. Thus, where two firms agree to share profit and loss upon contracts for the purchase or sale of merchandise, to be made by each firm in its own name and to be executed with its separate funds, they are not liable as copartners, either between themselves or as to third persons. *Smith* v. *Wright*, 5 Sand. S. C. R. 113.

In the present case, each institution transacted business in its own name, and with its own funds, and neither of them had such a lien upon the funds of the other as to entitle it to be paid in preference to other creditors. The existence or non-existence of this lien is the criterion which settles and determines whether an agreement constitutes a partnership or not. *Denny* v. *Cabot*, 6 Met. 92; *Turner* v. *Bissell*, 14 Pick. 192; *Loomis* v. *Marshall*, 12 Conn. 69; 1 Smith's Lead. Cas. (5th Am. Ed.) p. 984.

The evidence in the case conclusively establishes that there was no joint promise or undertaking of the two institutions.

It also conclusively establishes the fact that there was no joint reception of the representatives of money from the plaintiffs, from which a joint promise can be implied to repay them. The case rests solely upon the alleged agreement, by which it is claimed that the bank became a partner of the insurance company, because it received a portion of the profits of the business of that company.

The next question to be considered is, whether the relation of principal and agent existed between the bank and the insurance company in respect of the business transacted with the plaintiffs, so that the bank can be charged as principal, and the insurance company treated as an agent. In regard to the evidence introduced for the purpose of showing that the two institutions held themselves out to the world as one and the same, it may be again remarked that the law made known to the plaintiffs that the two corporations were separate and distinct from each other. It may also be further remarked, that the plaintiffs actually knew that such was the fact. The plaintiffs, therefore, cannot claim that they have been injured, or acquired any rights, by reason of the manner in which the two institutions transacted their business. The deposits of the plaintiffs were made with the insurance company, and with the understanding on their part that it was the principal, and the only party who was liable to them for their repayment. They never supposed that they were dealing with the bank, or that the bank was in any manner liable to them. Knowing all the facts, and dealing with the insurance company as the principal, they cannot now claim that they were misled by the manner in which the two institutions held themselves out to the world in the transaction of their business. If the plaintiffs had supposed that they were making their deposits with the bank, or that the insurance company was acting as the agent of the bank, they might with propriety urge these things for the purpose of charging the bank according to their understanding at the time, but as the plaintiffs never supposed that they were making their deposits with the bank, or that the insurance company was acting as its agent, they cannot now insist that some one else might have thought that such

was the case. If the plaintiffs knew of the actual relation existing between the bank and the insurance company, their conduct was an election to rely upon the credit of the latter, and they cannot now charge the former. They did know that by law no such relation could legally exist, and they supposed that no relation in fact existed.

G. F. BAILEY, for Appellees.

On the trial of the cause, it was contended by the counsel for the plaintiffs that the defendants could not recover, because, whatever might have been the relation, in fact, of the bank and insurance company, between themselves, still, in law, as they were distinct corporations, they could not unite, so as to render themselves liable as copartners, nor could they establish the relation of principal and agent.

It seems to be necessary, therefore, in this case, to consider only the question whether there is any inflexible rule of law prohibiting one corporation from employing another as its agent, so that, under no circumstances, can the relation of principal and agent arise. The question of fact as to the existence of an agency has been left to the jury; and it will be observed that the bill of exceptions does not profess to preserve all the evidence; but if it did, the record shows enough from which the jury may have found such an agency to exist.

It will not, I presume, be denied, that corporations may appoint some classes of agents. They can only act by and through their agents; and therefore it would seem that their powers, in this respect, should be as large, at least, as individuals have. An individual may certainly employ a corporation as an agent. Is there, then, any reason why a corporation may not lawfully do the same? 3 Seldon, 459; 12 Barbour, 27; 22 Wend. 215; 25 Ill. 243.

It may be contended, however, that the matter of receiving deposits in the name, or through the agency of, the insurance company, was foreign to the powers and business of the Marine Bank, and therefore its acts in such transactions, create no liability. This position is untenable.

Both these institutions were created for banking business, and a very important part of such business at all times is the receipt of deposits. The insurance company was allowed to receive twelve per cent. on money loaned, and had no individual liability clause in its charter; while the Marine Bank, having been organized under the general banking law, could take but ten per cent., and its stockholders were individually liable for its debts; but it had the privilege of issuing bills, which the insurance company had not. It will be seen, therefore, that it might be largely for the interests of the bank, to unite with the insurance company, or make use of it to receive deposits, and loan money, if it could thus obtain its additional privileges; and the adoption of the insurance company's name would not prevent a recovery against the bank. 12 Barb. 27.

The Marine Bank, at all events, had a right to receive deposits; this was in the line of their business, and within the scope of their powers; and if it were true, which I deny, that it could not lawfully receive them jointly with, or in the name of the insurance company, still if it did do so, this would be only the prosecution of their business in an improper manner; and would not enable it to deny its liability for deposits made without any wrong on the part of depositors. The principle which governs in this class of cases is recognized in *City of Pekin* v. *Newell*, 26 Ill. 320.

But it is said that Mr. Ogden, one of the defendants, knew that these institutions were separately organized, or incorporated, and that by allowing the deposits to be entered in a bank book, headed with the name of the insurance company, he elected to treat the insurance company as debtor. Now, it was not denied by defendants that they were separate organizations, but it was claimed they subsequently associated together in business in some way, either jointly, or with the bank as principal; and both Mr. Ogden and his cashier testified they supposed these institutions were one and the same. The doctrine of election cannot therefore apply; it prevails only, where the creditor *knowing* of the relation, accepts the agent as the debtor. Story on Agency, sec. 446 a.

If these institutions could unite in business, either jointly, or as copartners, and the facts in the case would have warranted a jury in finding such a connection, the judgment of court below must be affirmed.

It appears to me, that there is no rule of law, or public policy, prohibiting two corporations from entering into a joint contract, or undertaking, in the pursuit of their lawful business. Such a union is frequently necessary to the success of their individual interests, and unless upheld, much of the value of their corporate privileges would be impaired. Take, for example, intersecting or connecting lines of railroads. They find it profitable to contract for the safe delivery of persons and property, over lines connecting with their own, and such contracts are binding. Suppose they should enter into a joint lease for a piece of ground or building, to be used in common for a depot; would it be contended, that the contract was not binding, simply because it was a joint one? *Sharon Canal Co.* v. *Fulton Bank,* 7 Wend. 412; Angell & Ames on Corporations, 248.

In *Catskill Bank* v. *Gray,* 14 Barb. 471, it was held, that a corporation may, by participation in the profits of a business, become liable as a partner; and the present tendency of jurisprudence is to assimilate the liability of corporations to that of individuals. Corporations have become so numerous, and represent such a diversity of commercial interest and enterprise, that the courts have found it necessary to depart from the strict rule that prevailed when they were confined to public, municipal or ecclesiastical objects, that a corporation could not bind itself except by vote of its directors, and then in matters strictly within the powers expressly conferred by their charter, and to hold them liable for acts outside their charter, even where they have held themselves out as having authority and have received the benefit of such acts from innocent persons, unless the act, or charter, expressly makes void the contract sought to be enforced. *Bissell* v. *N. I. & M. S. R. R. Co.,* 22 N. Y. Rep. 258; *Parish* v. *Wheeler,* 22 ib. 494; 30 Verm. 159; 27 Verm. 399; 29 Verm. 93; 7 Gray, 393; 19

Ill. 253; 17 Barb. 378; 16 Mass. 94; 2 Conn. 255; 3 Cush. 107; 14 Penn. 83.

In the case first above cited from 22 N. Y., the authorities on this subject are fully collated in the elaborate opinion of Judge Comstock.

The law of 1861 has no bearing on this case. It was passed, among other reasons, to favor banks which would redeem in Chicago, and, as its title imports, " to afford greater " instead of less " security to the public." Section 5, article 4, prohibits them from giving their money to others to loan. This is a case of deposit simply, and presents no violation of that section. Besides, the section provides a penalty, increasing the creditor's rights. It does not avoid the contract, and therefore, were this a case falling within its terms, under the rule above stated, the bank could not set it up in defense of its own wrong.

The agreement to take currency did not stand in the way of a recovery.

It was made nine days after this deposit, and could not have a retroactive effect, and was not so intended; but related to future deposits.

It was violated and rescinded by the bank and insurance company on the 17th May, after which they refused such bank notes as are mentioned in the agreement, except on special deposit; they were not received in the transaction of business. Defendants were therefore no longer bound by it. 26 Ill. 396.

From the conduct of the bank in rescinding the agreement so soon, and the assortment of its funds while it lasted, the jury were authorized to infer that it was not entered into in good faith, and if not, the defendants could disregard it, and recover for money had and received during its continuance even; and, a fortiori, for deposits previously made.

If the defendants were entitled to recover at all, the amount of the recovery was right, and no objection can be made to the form of action or counts.

The draft deposited was payable in dollars, and for aught that appears, was paid in money worth one hundred cents on

the dollar. It was so entered in the bank book. 2 Peters, 318; Angell & Ames on Corporations, 221.

If it was paid in currency, their liability is the same. Currency signifies par money (20 Ill. 144, 255), and so the bank understood it; else why did they write over the letters " cy " on the bank book, as late as the 11th of May, " Ill Bk n " ?

No question as to the right to recover in this form of declaration was made at the trial. It was, for the first time, urged on the motion for a new trial.

WALKER, J. At the time this deposit was made and the check was drawn in favor of Bailey, no agreement had been entered into by the parties to receive Illinois bank bills in ordinary business transactions. Nor does the deposit or bank account of appellee with appellant show such an agreement. There seems to be no question, if suit had been instituted on the day the draft was drawn, that money alone would have discharged the liability. It was a general and not a special deposit, and when made, bank paper was but slightly depreciated. Up to that time it is not probable any difference was made between bank bills and money. This deposit was for dollars, and not marked as currency or bank bills. Subsequent to the 20th of April, 1861, when the draft was drawn, and the deposit was made, the deposit account distinguished between currency and specie. The drawing of the draft was an assignment of that sum on deposit, by the depositor to the payee of the draft. Bailey became entitled to sue upon the draft, and to recover the amount from the bank. *Munn* v. *Burch*, 25 Ill. 35.

This amount of the deposit having been, by appellees, appropriated to Bailey, and he or his assigns holding it at the time the agreement to receive Illinois bank bills during the continuance of the war, was entered into, they could not be affected by it. It also appears, that the check was not returned to appellees, until after the currency became so far depreciated, that the agreement was no longer regarded by the parties. Then did it return to appellees in the same condition in which it was held by Bailey and subsequent

indorsees ? We can perceive nothing in the evidence, nor are we aware of any principle of law, that should change it from a draft for cash, to an instrument for bank bills worth no more than one-half of their nominal value. The mere change of ownership, by its return to appellees, could work no such change. When they took up the check the rights and liabilities of the parties were revived, as they were when the instrument was drawn.

The only remaining question to be considered is, whether. appellant is liable on the deposit made in the name of the insurance company. These institutions were not capable of forming a partnership, and the jury were so instructed. They no doubt could have made joint contracts, by which both bodies would have been liable. But in this case they are not jointly sued, nor does the evidence show a joint liability. The court below instructed the jury, that if they believed, from the evidence, that the bank was the real party in interest, and the insurance company was only its agent to carry on this business, they would be warranted in holding the bank liable. That a bank may employ agents in the course of their business, and that a banking institution may act as such agent, will not be controverted.

It is not material to the liability of the principal, that the business should be transacted in his name by the agent. The real question in such cases is, whether the relation of principal and agent existed in the transaction. It then follows, that if appellant was the principal, and the insurance company was only the agent, and the deposits were made with appellant, although in the name of the agent, the bank is liable. This question is one of fact, for the consideration of the jury, and was fairly presented by the instructions of the court, and they have found appellant liable. After a careful examination of the evidence, we are unable to say that the finding is not supported by the evidence. It may not be of such clear and satisfactory character as to leave no doubt, but we regard it sufficient to warrant the conclusion at which the jury have arrived. The judgment of the court below is affirmed.

*Judgment affirmed.*