PHILIP ALLEN & SONS vs. WOONSOCKET COMPANY.

A corporation was created by the Legislature of Rhode Island under the name of the W. Co. Nothing in the act of incorporation specified the business to be done, nor did anything in the corporate name suggest it. All its stock was held by a single stockholder. The corporation entered into a partnership with A. to be terminated at will by the corporation: —

*Held*, that the partnership was not *ultra vires* on the part of the corporation.

*Semble*, that if A. was to have no control as partner, and was to receive part profits for his services, the partnership would not on any principle be *ultra vires* on the part of the corporation.

The statute of limitations does not apply so long as a partnership is existing, and each partner is exercising his rights, and enjoying his own property ; but begins to run so soon as the partnership is dissolved, or there is any exclusion of one partner by the other.

In equity proceedings questions of law should be raised by demurrer if possible, if not as soon as possible *in limine*.

A defence which is a subject for demurrer should not be made in an answer, although the same benefit be claimed as if it was made by demurrer.

What constitutes stated accounts is to be determined by evidence.

Setting down for argument a plea of stated accounts is equivalent to demurring to it.

BILL IN EQUITY brought by the surviving copartners of the firm of Philip Allen & Sons against the respondent corporation, charging that there had existed between the respondent and the complainants a copartnership to carry on the business of calico printing. The prayer of the bill was for an account and settlement. The facts as found by the court are sufficiently stated in its opinions.

*February* 3, 1876. POTTER, J. The old firm of P. Allen & Sons having failed, and all the parties having made assignments in 1857, a new firm, under the same name, was formed by the same parties, by an agreement in writing, November 26, 1858.

In June, 1858, the print works formerly owned by P. Allen & Sons were sold by their assignees, and purchased by the Woonsocket Company (a corporation chartered by the legislature in 1832), who had occupied them on lease from the assignees of P. Allen & Sons after their failure.

The bill alleges that said defendant corporation, by Crawford Allen, its agent, on November 26, 1858, formed a partnership with P. Allen & Sons, to carry on said printing business ; the corporation to furnish the works and capital, the said P. Allen & Sons to manage the business and devote their skill, attention,

and influence to it, and to receive for such services a salary of $200 per month, and twenty per cent. of the profits of the business, and that said business was so carried on until Philip Allen's death, on December 16, 1865, when the agent notified said P. Allen & Sons that their interest in the business ceased; that large profits were made; and that complainants received the salary, and a portion but not all of the share of profits they were entitled to, and praying for an account and payment of the balance that may be found due.

The answer denies the partnership, contends that such a partnership could not legally exist, as being *ultra vires* on the part of said Woonsocket Company; that if it existed, it was terminated when. the mill stopped in December, 1864, or when the accounts were closed and a new arrangement begun in May, 1865, instead of December 16, 1865, the date of Philip Allen's death; and that therefore the suit is barred by the statute of limitations, the bill not being filed until December 15, 1871; denies that any moneys were paid to P. Allen & Sons as a part of profits, but that what was paid over and above the salary was a gratuity, and for the use of a trade-mark, and not of right under contract; that stated and true accounts were rendered and allowed and settled by the parties, the last in December, 1870. The respondent claims the benefit of these allegations as if pleaded.

The answer also sets out other matters which, though bearing on these questions by way of inference and evidence, need not be noticed now.

The answer further alleges that on December 12, 1871, P. Allen, Jr., one of the complainants, released all claims against the respondent for services as partner or individually.

The first point of defence is that the respondent, being a corporation chartered by the Legislature of Rhode Island, had no power to enter into a partnership; that the whole proceeding would be *ultra vires*.

The grounds on which the proceedings of corporations have been held to be void, as being beyond the powers given them by their charter, have been chiefly these : —

*First.* Because public policy requires that corporations should be confined to the business, and to the mode of managing that

business prescribed by the charter, which is their law, and which they are bound to obey.

The act incorporating this company was passed at the January session A. D. 1832. It incorporates the Woonsocket Company. It seems strange, but is true, that no portion of the act specifies what business is to be done by the company, nor can its business be inferred from anything in its name.

*Second.* Because the individual stockholders of the company have a right to require that the corporation shall be confined to its legitimate business. They have invested their money on the faith that it will be so confined. A majority have no power to change it. The stockholders have invested their money also on the faith that its business will be managed by the officers provided for in the charter, and in whose election they have a voice; and while a majority, through their officers and agents, may make many binding contracts, they cannot transfer the whole control of their affairs to a body foreign to themselves.

Now, in this case, the charter does not specify by what officers the business of the corporation shall be managed; and during the whole period involved in this suit, the Woonsocket Company had but one single stockholder. Crawford Allen owned the whole stock. There was no other stockholder with any right to complain that the business had been changed, or that the corporation had put the management of any portion of its business beyond its own control. And this, we think, makes a material difference between the present case and the cases to which we have been referred on the part of the respondent. The reason of the rule ceasing, the rule does not apply.

And besides, the partnership here set out was merely a partnership at will; and the corporation could terminate it and resume the full control of their business at pleasure.

And if the agreement was merely an agreement to pay a part of profits for services without giving the complainants the control as partners, then it would not on any principle be *ultra vires*.

In this case this point is raised in the answer, and the respondent claims the benefit of it as if he had demurred or pleaded.

As presented in the answer, it does not seem to be the proper subject of a plea. The point that a corporation cannot enter into a partnership is a pure matter of law.

The Rules of the United States Supreme Court of 1822 (7 Wheaton, page x. Rule 23), and the similar Rhode Island Rules of 1837 (see R. I. Reports, vol. 1, page xxii. Rule 20), allowed all defences to be made by answer. But after a temporary trial of it, the United States Supreme Court altered its rule in 1842 (17 Pet. page lxvii.; 1 How. page liii. Rule 39), and our Supreme Court followed in July, 1857 (R. I. Reports, vol. 4, page 570, Rule 40), so that a defence which is a proper subject of demurrer ought now to be made by demurrer as anciently. The English rules have always required it, although the chancery commissioners recommended a greater latitude.

While even if it appeared upon the hearing that the complainant was not by law entitled to relief, he would not prevail, still where it is a mere matter of law, it should be so presented. In the present case if the contract was void for that reason, no answer would be required, the pleadings would be simplified, the litigation ended, and the time of the court and of the parties would be saved. Payment of costs is but a small penalty.

There may be many cases where it may be difficult to determine whether to plead or demur, and there should always be a reasonable indulgence with liberty of amendment. In the present case, the fact that the respondent is a corporation, which the respondent relies on, does appear in the bill; but the important fact, that Crawford Allen was sole stockholder of the respondent company, does not appear until the answer is put in.

All we mean to say is that questions of law should be raised by demurrer, where it can be done; and if not by demurrer, then as soon as possible *in limine*.

The bill alleges a partnership. The respondent was to furnish the works and capital, the complainants to have the charge and management, and devote their skill, attention, and influence to it, and for their services were to receive a salary and a certain portion of the profits.

Now an agreement where one person puts in nothing but his skill may constitute a partnership, and subject the parties to all the liabilities of partners; and a person who puts in nothing but his skill may have the control of a partner. There is evidence that Philip Allen did have the entire control at the works; and there may be cases where partners by agreement may, as regards each other, divide the control of their business among them-

selves, each taking his part. But there is no need of going into the evidence upon this point of the degree of control exercised by the complainants, as there is here no question of any account of, or liability for losses; it is practically the same as if it was a mere agreement to pay a part of profits for services without more. In either case, if proved, the right to an account would follow.

Is such a contract proved? It is said that the complainants have gained an advantage by suing the Woonsocket Company, instead of Crawford Allen's estate, as, in the latter case, he being dead, neither of the complainants could have been a witness.

From the manner in which the accounts were kept, and the receipts for payment given, it is difficult to see how the suit could have been brought differently.

The evidence of the contract, to our minds, depends not on the testimony of the complainants, but on that of persons who have no interest in this case, and on facts and circumstances not disputed.

It is proved by the evidence of Mr. Wilkinson (who, though not interested in this suit, is said to have a suit of his own against the respondent); of one of the complainants, Philip Allen, Jr., now deceased, who, having settled and released the respondent, had, at the time he gave his deposition, no interest whatever; by the evidence of Zachariah Allen and Sullivan Dorr; by Crawford Allen's admission, made to Zachariah Allen and to Wilkinson and also to Dorr; and by the papers containing the figures made by Crawford Allen himself, and not disputed; all confirmed by numerous other circumstances in the case. And Mr. Nightingale testified to conversations with Crawford Allen, not only in 1865, when arranging for the lease, but at a period before that, when he was led to inquire, by reason of noticing that such large sums were paid to the complainants over and above the salary. The amount of payments to them was: —

For the part year, ending June 1st, 1859 . . . $1,940 00
For the year ending June 1st, 1860 . . . . . 5,900 00
"      "      "      " 1861 . . . . . 8,000 00
"      "      "      " 1862 . . . . . 3,800 00
"      "      "      " 1863 . . . . . 5,700 00
"      "      "      " 1864 . . . . . 8,390 00
"      "      "      " 1865 . . . . . 1,100 00

And these, while it is agreed that the fixed salary was to have been only $2,400. We have taken the years as ending June 1st, because in some of the accounts put in by the respondent they are so stated, not because there is any evidence that the agreement was made before it is alleged to have been.

In determining whether it was a mere gratuity, it is a fact to be considered that Crawford Allen kept an exact account of his payments, and against a firm who (except for what they might hope for from this source) were hopelessly insolvent, and who, according to the claim of the respondent, owed the estate of Crawford Allen a very large amount at the time the contract was made, and also that the receipts for these large sums were taken on account.

This is easily explained, if we consider that there was to be another side to the account.

When Mr. Wilkinson, in order to make up the accounts, asked Crawford Allen to give him the credit side of Philip Allen & Sons' account, he replied that he would, and that it would take a great deal of figuring to ascertain Philip Allen & Sons' share of the income tax to be charged to them. Mr. Wilkinson had told him before, that the account ought to be settled or adjusted, and he had promised to do it. If the respondent's claim is correct, the account had already been a great deal more than settled. The indebtedness, although so large, was also, and with Crawford Allen's approbation, left out of his statement of assets. This latter circumstance is not of itself of much weight, because if it was a debt it was valueless.

As far back as 1858, at the time Crawford Allen bought the property, he had told his brother, Zachariah, that he intended to operate the print works in connection with Philip Allen & Sons, and to give them an interest in the business. After Philip's death, in 1865, he told Zachariah that he had notified the sons that their interest terminated with their father's death. He at one time asked him why he did not have the accounts made up, as all advances now stood charged to them without any credits. Crawford replied that he was not ready to settle yet. The same remark applies here, that if there were no credits to be given, there was nothing to settle.

This evidence alone would be enough upon the main point.

The rest of the testimony might be thrown aside, except as furnishing dates and details.

That if there was any contract it was with the firm, and not with Philip Allen alone, is sufficiently proved by the payments made, and by the form of receipts given.

That the portion of the profits was to be one fifth, we think is also sufficiently proved.

Several circumstances have been urged as throwing discredit on the complainants' case.

It is said the complainants, Charles B. Allen and Philip Allen, Jr., took the benefit of the poor debtor's oath in 1858. The oaths under their petitions in insolvency were not taken until October 1, 1858.

The old firm of P. Allen & Sons had been dissolved by their common insolvency and assignment of all their property. This firm was not renewed until November 26, 1858, and the contract on which this suit is brought is alleged to have been made after that. No contract with them, as a firm, could have been made before, although it might have been contemplated, or talked of. It seems that payments, apparently as a salary, had been made before, but there is nothing to show that any agreement was made for them to have any interest in the profits, until the date they allege.

It is said, that as the bill was first sworn to, it alleged the contract to be made in June, and that it was afterwards amended to state it as made in November; and that this was done to put the date of the contract after the date of the oaths before alluded to.

On examining the bill and amendment, we cannot see that it is anything more than the correction of an evident mistake, as no firm of P. Allen & Sons existed with whom a contract could be made until November, 1858. And it appears that Philip Allen had been assisting in the management from the time of the purchase.

It is also said, that shortly before bringing this suit the complainants bought up the claims against the old firm upon representations made to the creditors that these claims were of little value. These claims were purchased by Sullivan Dorr. We cannot find any evidence that Dorr was in any sense the complainants' agent, or was employed by them, or that Charles B. Allen has ever reimbursed or agreed to reimburse him for his

payments. On the contrary, Mr. Dorr says that at the time of his own failure some years ago, he could not have begun business again but for pecuniary aid from Philip Allen, the father, and this was what influenced him to help the sons. And we cannot find any evidence to the contrary.

There were reasons growing out of the situation of the parties why the contract was not made more public, and why the credit side did not appear on the books. But we consider the evidence ample, and after allowing all proper weight to these latter considerations suggested by the respondent, we cannot think they seriously affect the testimony.

The next defence is the statute of limitations. A mass of evidence has been put in as to dates of payments, and many authorities cited as to what will take a case out of the statute.

We are of opinion that the partnership or agreement cannot be considered as terminated until the death of Philip Allen, December 16, 1865. Although the works had stopped in 1864, they prepared to start again in the spring of 1865, and the evidence shows that Philip Allen assisted in the management as he had done before. There is no evidence that Philip Allen ever claimed or acknowledged that the agreement had terminated, or that Crawford Allen ever notified Philip Allen to that effect; but there is evidence that, after Philip's death, Crawford told Zachariah Allen that he had notified the sons that their interest terminated on their father's death.

"So long," says Lindley, "as a partnership is existing, and each partner is exercising his rights, and enjoying his own property, the statute, it is conceived, has no application at all; but as soon as a partnership is dissolved, or there is any exclusion of one partner by the other, . . . . the statute begins to run." 2 Lindley on Partnership, 1024. And we think this principle applies in whatever light we are to consider the agreement in this case. See also *Patterson* v. *Brown*, 6 T. B. Mon. 10.

It seems, also, that after the alleged new agreement of April, 1865, and after Philip Allen's death, payments of large sums continued to be made to P. Allen & Sons, viz. : —

| | |
|---|---|
| July — December, 1865 . . . . . . . . . | $ 8,600 00 |
| For the year 1866 . . . . . . . . . . | $11,700 00 |
| "      "      1867 . . . . . . . . . . | $15,400 00 |
| "      "      1868 . . . . . . . . . . | $12,200 00 |

And the last three years were after the old partnership or agreement terminated, and while the salary or payment for the trade-mark was only to be $4,000 *per annum.* These facts, taking place as they did after the death of Philip Allen, we think throw a pretty strong light back upon the previous relations of the parties, and can only be accounted for on the supposition that they were payments towards an old indebtedness.   And they confirm and explain the testimony of Philip Allen, Jr., who says that after his father's death his uncle Crawford told him there was "a fund in his hands, the interest of which would enable" them " to live like gentlemen."

The accounts, during this period, were kept in a different set of books, but were afterwards carried back to the old books.

And the complainants say that they knew nothing of any new arrangement, in 1865, any further than taking in some new partners.   The evidence shows that Philip Allen continued to assist in the management up to his death, when Zachariah Allen, who also says that he knew nothing of the new lease, took his place.

And it is to be noticed that, during these latter years, when payments were made, the receipts signed by P. Allen & Sons continued to be given to the Woonsocket Company, and on account, as before.

It would be obviously unjust, that the complainants should be prejudiced by any arrangement Crawford Allen might make to lease, or take in other partners, which did not interfere with their interest.

And it would be equally unjust to allow them to be prejudiced by the mode in which Crawford Allen chose to keep his books, or to change them from time to time.

It is claimed that statements of profits were, from time to time, declared, and that the statute would run in each case from such time.   We can see no evidence of it.

The respondent claims that certain accounts have been rendered which he claims the benefit of as if pleaded in bar as stated accounts.

When a plea is made of stated accounts, if the plea is set down for argument, which is equivalent to a demurrer, the plea is to be taken as true, so far as to determine its sufficiency, *i. e.* is it sufficient if true ?

But the question now to decide is not, is the plea legally sufficient, but is the plea true? *i. e.* are there or have there been any stated accounts in the case? And this we must decide upon the evidence.

What is meant by an account stated? It means an account made up, stated, and adjusted by the parties, and a balance struck, or so that it may be struck. The very form of the plea was that the parties " did make up, state, and settle an account," &c. Curtis Eq. Prec. 169; Story Eq. Jur. § 523.

A stated account properly exists only where accounts have been examined and the balance admitted as the true balance between the parties. Story Eq. Pl. § 798.

The mere rendering an account does not make it stated; but if the party receives it, admits its correctness, claims the balance, or offers to pay it, it becomes stated. *Toland* v. *Sprague,* 12 Pet. 300, 335.

The presenting of an account upon one side and the acknowledgment of it on the other might also be evidence of an adjustment.

But (says Judge Story) acquiescence, though for a considerable time, by no means establishes the fact of an account being settled, unless there are other things in evidence to justify such a conclusion. Eq. Jur. § 528.

If an account in this case had been made up and presented to the other side by the complainants, and they were now seeking to correct it, there would then be some similarity to the case of *Greene* v. *Harris,*[1] which the respondent refers to in his brief.

And generally an account to be considered stated should be such that it could be sued at law.

The respondent, in its brief, seems to consider that if it sets up the defence of a stated account that the burden is on the complainants to disprove it. Such is not the law. So far as the answer is responsive to the bill (as *e. g.* in this case the complainants assert, and the respondent denies the agreement or partnership), the complainants must prove it. But when the answer sets up a matter in avoidance, then, although sworn to, the defence must be made out by the respondent, and the burden is on

---

[1] 9 R. I. 401; 10 R. I. 382; *ante,* p. 5.

him. Story Eq. Jur. § 1529; Eq. Pl. § 849 *a.* See this subject fully and ably stated by Ch. Kent, in *Hart* v. *Ten Eyck*, 2 Johns. Ch. 62, 89, and the cases there cited. The decision in this case was reversed by the Court of Errors,[1] but not upon the point here stated. The Court of Errors held that the answer was in some part responsive to interrogatories, and therefore should have the weight it was entitled to under the law on that subject.

And this rule is recognized, and the opinion of Kent, in *Hart* v. *Ten Eyck*, approved of by the Court of Chancery of New Jersey, where they say it has always been recognized as law. *Stevens* v. *Post*, 12 N. J. Eq. 408, 410.

And the answer here by the corporation is not under oath.

In this case "the respondent must make out his defence, and show that the accounts he pleads come up to the description of stated accounts," in order to be a bar to the claim. *Greene* v. *Harris, ante*, p. 5.

Considering the facts proved, and the relations of the parties, and the evident reasons for not demanding a speedier settlement, it seems to us that to allow to these papers the weight of stated accounts would be a great perversion of justice.

It is stated in the answer, and also relied on in the brief, that not only were accounts stated and rendered and settled, but that a balance was paid by the complainants. We can find no evidence of any such payment by the complainants.

We are therefore of opinion that the complainant is entitled to relief.

After the foregoing opinion had been given the case was reargued at the request of the respondent.

*July* 22, 1876. POTTER, J. The brief of the respondent, on the reargument of this case, complains of several misconceptions of fact and misstatements of law in the former opinion of the court.

The first misconception of fact complained of is the statement in our former opinion, that a new firm of P. Allen & Sons was formed on November 26, A. D. 1858.

The old firm had been dissolved, as we stated in the former opinion. The firm was not only actually insolvent, but each

---

[1] See *Woodcock* v. *Bennet*, 1 Cow. 744, note (*a*).

member of it had applied for and taken the benefit of the state insolvent laws, and had executed an assignment for the benefit of his creditors.

If this did not effect a dissolution of the firm, it is pretty difficult to imagine circumstances which would.

Judge Story in his Partnership, § 313, lays it down that " the common law, the Roman law, and the modern foreign law, all concur in the same general result, that bankruptcy or insolvency is of itself, by mere operation of law, a complete dissolution of the partnership. *A fortiori*, the like doctrine applies where all the partners become bankrupt, for then the whole property is divested out of all of them." And that the good will of a concern (so far as it is local and arises from an established place of business), while it cannot well be divided, may be sold by assignees, see Story on Partnership, § 99; 1 Parsons Contracts, \*153, bk. I. cap. 12, sec. 3 ; *Cruttwell* v. *Lye*, 17 Ves. Jr. 336; *Williams* v. *Wilson et al.* 4 Sandf. Ch. 379 ; *Mellersh* v. *Keen*, 27 Beav. 236 ; 28 Beav. 453 ; *Turner* v. *Major*, 3 Giff. 442 ; *Dougherty* v. *Van Nostrand*, 1 Hoff. Ch. 68. And as to the difficulty of laying down precise rules in these cases, see the remarks of Wigram, V. C., in *Willett* v. *Blanford*, 1 Hare, 253, 269. And so far as a trade-mark is connected with a place or with any particular recipe for manufacturing, it may be sold; but where it depends more or less on personal skill and reputation, it is more difficult to regulate as property. See cases in 2 Parsons Contracts, \*257, bk. III. cap. 15, sec. 4, C.

Whether Philip Allen & Sons considered it a new firm, or a mere continuance of the old one, is a matter of little consequence, except so far as it affected the opinion of the court upon those circumstances relating to the amendment of the complainants' bill, which the respondent claimed were calculated to throw suspicion upon the honesty of the complainants. That the old firm was in law dissolved there can be no doubt. Its renewal or continuance did not require a written agreement, but they chose to make one in writing.

Our attention has again been called to the doctrine of " Ultra Vires," and it has been strenuously contended that the Woonsocket Company had no power to purchase and operate print works or to enter into a partnership.

The grounds, as before stated by us, on which proceedings of corporations have been held void as being beyond their charter powers, have been (see Kindersley, V. C., in *Shrewsbury* v. *N. Staffordshire R. R. Co.* 35 L. J. Ch. 156, 172 ; quoted in Brice on Ultra Vires, by Green, p. 35 ; see also Selden, J., in *Bissell* v. *Mich. South. & North. Ind. R. R. ·Cos.* 22 N. Y. 281), —

*First.* Because the charter, when accepted, constitutes a contract between the stockholders that the corporation shall be confined to its proper business, and that a majority cannot change it. A minority have been held bound in some cases by the fact of the acquiescence in or ratification of the acts of the majority.

In the present case there was no one who had a right to complain on this ground, Crawford Allen being sole stockholder.

*Second.* Because public policy requires that they should be confined to the business and the mode of managing business prescribed by the charter, which is their law.

In the present case the charter was passed in 1832. No portion of the act specifies even by implication the business to be done, and nothing can be implied even from its name.

Where a corporation is created for special purposes, there is no doubt that it must be confined in its operations to those purposes, and it can only exercise the powers expressly granted or impliedly necessary to carry out these purposes. But in the construction of its powers it may be sometimes very important to consider whether the corporation is bound to show that the act done is within its granted powers, or whether the contestant is bound to show that it is beyond them.

In the present case the question is very important. The powers to buy and sell land, &c., &c., are merely the powers usually granted to all corporations for whatever purpose incorporated. But the purpose or object is nowhere declared.

And the general rule may be stated to be that it lies on those who impeach the contract to show that it is avoided. Brice, Ultra Vires, by Green, cap. 1, § 3, and cases cited.

The contrary rule, which is contended for so earnestly by the counsel for the respondent, would probably produce a great deal of litigation in this state. It is believed there are many charters of corporations doing a very large business where in the charter itself no purpose whatever is specified (although in one, the Lons-

dale, it is·described in the title of the act, and there only as a manufacturing corporation), and a still greater number where the intended business can only be inferred from the name. In such cases the fact that the persons incorporated were doing a particular sort of business when incorporated, and the fact that the legislature and the corporators have acquiesced in the doing of a particular business, or in a continued course of dealing, might be entitled to weight.

In this case the contention is that the respondent had no right to form a partnership, that a corporation must transact its business through its proper officers, and cannot delegate its powers in such a manner as to put its business beyond its control.

If the partnership had been for a definite period, it might well be argued that the respondent had no right to make such a con-.tract. But it was a mere partnership at will, terminable at any moment by either party. The respondent, therefore, did no more part with the control of the business than if it had employed Philip Allen & Sons simply as agents, and its right to do that cannot very well be denied.

We have examined carefully the authorities to which we have been referred. Brice, Ultra Vires, part III. cap. 2, iv., does indeed say, that "agreements between companies which create a partnership between the parties thereto are void." The leading case he refers to is *Charlton* v. *Newcastle & Carlisle R. R. Co.*, reported in Weekly Reporter, vol. 7, but more fully in 5 Jurist N. S. 1097, before Page-Wood, V. C., where two corporations contracted for a permanent amalgamation. This would have been equivalent to the creation of a new corporation without the consent of parliament.

And it is recognized by this author, that certain arrangements may be made for division of profits or as to traffic, where there is no transfer of the powers of the corporation or merger of either separate corporation in a constituted whole.

The counsel have referred us to four American cases : —

1. *Whittenton Mills* v. *Upton et als.* 10 Gray, 582. The Whittenton Mills were incorporated for the purpose of manufacturing cotton goods. In 1842, the persons who had previously furnished machinery, &c., for them failed, and William Mason bought the tools, machinery, and stock, and hired the foundry, &c. Mason

and the Whittenton Mills then made an agreement by which the Mills were to advance the money to pay for said tools, machinery, stock, and rent, and for the labor required. Mason was to have a salary, and the profits on their business, patents, &c., were to be divided for five years. Subsequently the agreement was extended to seven years, the business to be done under the name of W. Mason & Co.; buildings and additional machinery obtained, and it was afterwards extended for three years more. In the purchase of machinery for the Whittenton Mills, the parties dealt with each other as strangers. Mason contributed to the partnership nothing but his skill and patent rights. And it appeared that other corporations for manufacturing cotton and woollen goods had machine-shops for making their own machinery, and some such corporations had sold machinery to other mills. The court hold that the corporation (p. 596) could not make a contract by which the control of its business should be put beyond the control of its officers or agents ; that (p. 597) the corporation could not engage in any business foreign to that for which it was created, or enter into any partnership for that purpose ; and (p. 598) that the charter was a public law, and all persons dealing with them must take notice of the extent of their powers. The court say it was not necessary to decide the question of the liability to third persons, nor the question of ratification by stockholders. The suit was to set aside proceedings in insolvency, and they were set aside.

2. *N. Y. & Sharon Canal Co.* v. *Fulton Bank*, 7 Wend. 412. A canal was made partly in Connecticut and partly in New York. The projectors obtained a separate charter from each state, but the corporations had the same stockholders and the same officers, and by by-law they had consolidated the stock. The suit was to recover funds deposited in bank in the joint name. The court said it was not necessary to decide whether corporations might consolidate or form a partnership, although general principles were against such powers, but they were tenants in common of the funds and could sue for them.

3. *Catskill Bank* v. *Gray & Ulster Iron Co.* 14 Barb. S. C. 479. The Ulster Iron Company leased to Gray its works for five years, reserving a part of the profits for rent, &c., with privilege to purchase at the end of the term. The suit was on drafts,

drawn by the superintendent and accepted by Gray, and the claim was to hold the Ulster Iron Company as partners. Counsel for the Ulster Iron Company contended there was no partnership, and the company could not form one. Held, that the Ulster Iron Company had an interest in the profits as profits, and were liable to third persons as partners, and that they could make such a contract as was made.

4. *Marine Bank of Chicago* v. *Ogden et al.* 29 Ill. 248. The Marine Bank was incorporated under the general law and could only receive ten per cent., and its stockholders were individually liable. The Chicago Insurance Company, under an old charter, could take twelve per cent. on loans. Both were under public acts. They had the same stockholders and officers and used the same room and vault, but their accounts were kept separate, and separate dividends were made. The profits of the bank in selling exchange, and of the insurance company on loans, were divided between the two. All the moneys in the vault were the property of the insurance company. Checks upon the bank were paid by the officers of the insurance company, and charged in account against the bank. The plaintiffs had deposited money with the insurance company, and sued the bank on the ground of liability as partner. There had been a depreciation in bank bills. Held, that it was a general deposit, and the holder of the check was not obliged to take payment in depreciated funds. Held, also, that the two corporations could not form a partnership but could make joint contracts. Here they were not jointly sued. The court below had instructed the jury, that if they were satisfied the bank was the real party in interest, and the insurance company only its agent to carry on the business, they might hold the bank liable, although the business had been done in the name of the agent. The verdict was for the plaintiff, and it was affirmed.

We can see nothing in these cases to affect the principle we have laid down.

To the argument, that the fact that there was only one stockholder cannot enlarge the powers of the corporation, we can only say that no such inference can properly be drawn from the language of the former opinion. That fact is only of importance upon the point that there were no stockholders with any right to complain of the acts of the corporation.

To the argument, that if the payments before 1865 prove a partnership they would also prove it afterwards, it is only necessary to say that we considered them as entitled to weight as evidences of an indebtedness before Philip Allen's death, which had not been settled.

We intended to decide and do decide, that we consider a contract of partnership, not of hire, proved.   That the contract continued to the death of Philip Allen, we consider as most positively proved.   If so, the defence of the statute of limitations is of no avail.

There is no satisfactory evidence that the agreement of 1865 had any effect upon the former relations of Philip Allen & Sons and the Woonsocket Company.   They were not ousted from their former control of the business, nor had they any notice that their control or interest was in any way affected by it.

And as to the proportion of profits, the complainants were to be entitled to that is to our minds satisfactorily proved.

Mr. Nightingale, who went into the business in 1861, says (page 2 of printed evidence) : " The fact that a so much larger amount than the nominal salary was paid led me to suppose that Messrs. Philip Allen & Sons had an interest in the business, and at an interview with Mr. Crawford Allen relative to my share in the business I proposed that it should be twenty per cent., and Mr. Allen said, that is what my brother has."   Mr. Nightingale afterwards (pp. 10 and 64) said he was unable to fix the date of this conversation.   He also states another conversation with Crawford Allen in 1865.   We have also the statements of Crawford Allen made to Wilkinson and Dorr, the figures in his own handwriting, and the evidence of Philip Allen, Jr.   And upon the general subject of the contract, see also the evidence of Hennessy, who, for aught that appears, is entirely disinterested.

It is also strongly urged that the contract between Philip Allen & Sons and Crawford Allen was merely a personal contract, or, as counsel say, a personal confidence.   We can only repeat that the mode in which the accounts were kept and the receipts given satisfies us that the contract was considered by both parties to be made with the respondent corporation.

We have considered all the points made on the reargument.

We have noticed some of them in this opinion.    We cannot see any reason for changing our former decision.

*Former decision affirmed.*

*Decree establishing the fact of the partnership as charged, declaring that the complainants were during such partnership entitled to a salary of $200 per month and to twenty per cent. of the profits, and referring the cause to a master in chancery to take an account.*    Decree entered October 2, 1876.