The complainants file this bill in equity for themselves and others, stockholders in the Hartford, Providence, and Fishkill Railroad Company, claiming relief against certain proceedings of the New York and New England Railroad Company and the trustees under certain deeds.
It being proved that some of the complainants were owners of stock in the Hartford, Providence, and Fishkill Railroad Company, the validity of whose acts sanctioned by a majority of the owners of its stock is in question, it is not necessary to inquire further as to the ownership of the stock.
And it is admitted that demand was made on the Hartford, Providence, and Fishkill Railroad Company to bring suit.
The Legislature of Rhode Island at its June Session, A.D. 1846, granted a charter to the Providence and Plainfield Railroad Company to build a railroad from Providence to the line of the State of Connecticut.
By section 16 of the charter they were authorized to "unite
with a railroad company" of any other State "to continue said railroad westward; and when the two companies shall be so united, the stockholders of one company shall become stockholders in the other company, and the companies shall constitute one corporation, by such name as the united corporations shall adopt." *Page 271 
There were further provisions for organizing a united corporation and for the performance of its duties.
By section 21 it was provided that "in lieu of the union" so provided for, the company might unite with such other corporation "by leasing their said railroad to such other company or taking a lease of such other road, or "by any other contract or agreement."
This charter was granted subject to the general law of Rhode Island, by which all acts of incorporation might "be amended or repealed at the will of the General Assembly, unless express provision be made therein to the contrary." Digest of 1844, p. 65, § 3.
In July, A.D. 1849, two companies chartered by the State of Connecticut, i.e. the New York and Hartford Railroad Company, and the Hartford and Providence Railroad Company, were by the authority of the legislature of that State consolidated under the name of the Hartford, Providence, and Fishkill Railroad Company.
At the January Session, A.D. 1851, of the Legislature of Rhode Island, an act amending the charter of the Providence and Plainfield Railroad Company was passed authorizing a mortgage, and containing certain provisions in contemplation of a union with the Connecticut road.
In A.D. 1851, the Providence and Plainfield Railroad Company, united with this Connecticut Company so formed, under the name of the Hartford, Providence, and Fishkill Railroad Company, and this union was ratified at the January Session of the Legislature of Rhode Island, A.D. 1852.
The Hartford, Providence, and Fishkill Railroad Company being thus formed, the State of Connecticut, in A.D. 1863, chartered the Boston, Hartford, and Erie Railroad Company, and it was organized in July. It was not incorporated in Rhode Island.
And on August 28, A.D. 1863, an agreement was made between this company and the Hartford, Providence, and Fishkill Railroad Company. This agreement is the principal subject of controversy in the present suit, its validity being attacked on the ground that it was fraudulent and ultra vires. The Hartford, Providence, and Fishkill Railroad Company were to make, and subsequently did make, a deed of their road and corporate franchises *Page 272 
to the Boston, Hartford, and Erie Railroad Company, and probably because the validity of the deed might be questioned, they also made a lease for nine hundred and ninety-nine years, with the right to have it renewed for a second term of nine hundred and ninety-nine years. While the lease or sale was made by the corporation, the consideration, except the assumption of its debts, was paid not to the corporation but to the stockholders. Each stockholder of the Hartford, Providence, and Fishkill Railroad Company was to receive a certain amount of stock of the new company on surrendering his stock in the old company, or might elect within a certain time to take a fixed sum in cash, $10 for each share of common, and $20 for each share of preferred stock, for his stock in the Hartford, Providence, and Fishkill Railroad Company.
The new company was to buy, for not over $5,000,000, two certain railroads and have them conveyed to the new corporation. The new company was organized by a subscription at Norwich of $5,000,000, on which nothing was paid in money, but the subscribers to the stock owned the two roads and conveyed them to the new company for $5,000,000, and then voted to cancel their subscriptions.
The contract is very truly described by the respondents as asomewhat complicated one.
It is claimed by the complainants that this contract wasultra vires and void for want of power in the Hartford, Providence, and Fishkill Railroad Company to make it.
There are two grounds on which the proceedings of corporations may be ultra vires and void, i.e.:
 First. As regards the State; the State confides to corporations certain powers, often great powers, affecting materially the rights and property of others. Public policy requires that they should be strictly confined to the limits fixed in their charters. They are the mere creatures of the law, and can have no powers but such as are expressly or by necessary implication given to them.
Second. "Because the individual stockholders of the company have a right to require that the corporation shall be confined to its legitimate business. They have invested their money on the faith that it will be so confined. A majority have no power to *Page 273 
change it. The stockholders have invested their money also on the faith that its business will be managed by the officers provided for in the charter, and in whose election they have a voice; and while a majority through their officers and agents may make many binding contracts, they cannot transfer the whole control of their affairs to a body foreign to themselves." Allen v.Woonsocket Company, 11 R.I. 288, 290.
"The act of incorporation is to them an enabling act. It gives them all the power they possess: it enables them to contract; and when it prescribes to them a mode of contracting, they must observe that mode, or the instrument no more creates a contract than if they had never been incorporated." Per Marshall, C.J., in Head Amory v. The Providence Insurance Co. 2 Cranch, 127, 169. The corporation is a mere creature of the law and can exercise no powers not conferred upon it. See CentralRailroad Co. et al. v. Collins et als. 40 Ga. 582; PacificRailroad Co. v. Seeley, 45 Mo. 212; Pearce v. Madison Indianapolis Railroad Co. 21 How. U.S. 441; Perrine v.Chesapeake Delaware Canal Co. 9 How. U.S. 172; Bank ofAugusta v. Earle, 13 Pet. 519.
What power then had the Hartford, Providence, and Fishkill Railroad Company to unite with another corporation or to lease or to sell to it?
It is a well settled principle of corporation law that when two corporations created by different States are consolidated, the new corporation can have in each State only the powers which the old corporation had in that State unless the legislature of that State, by the act of consolidation or other act, confers greater powers on it. And in this instance the State of Connecticut could pass no act to affect the existence or powers of the corporation in Rhode Island any more than Rhode Island could to affect it in Connecticut. By mere consolidation without further grant, the new corporation could only exercise in Rhode Island the powers of the old Rhode Island corporation; and so as to Connecticut. The Legislature of Connecticut could give the new corporation no new powers of control over the property in Rhode Island. Nor could they take away any: the charter might be repealed in one State and still subsist in the other.
There is an important difference between union and consolidation. *Page 274 
The latter ordinarily creates a new corporation into which the old ones are merged.
In the case of the Blackstone Canal Co. for making a canal partly in Rhode Island and partly in Massachusetts, the acts of union provided for an amalgamation of the stock, so that there should be the same stockholders in each company, but did not provide for consolidation. Judge Story held that each corporation still retained its separate existence in the State which had chartered it, although the stockholders were the same. Farnum
v. Blackstone Canal Corporation, 1 Sumn. 46. And even declaring that they are to be a joint company does not necessarily consolidate them. There must be a grant of the corporate powers to the new company as a new company. It is not necessarily a dissolution of the old; that depends on the intention of the legislature. So Judge Strong in Central Railroad Banking Co.
v. Georgia, 2 Otto, 665, 673. And even if consolidated, the new corporation stands in the place of each of the old ones, and holds and can exercise the privileges which belonged to each as to its portion of the road, and as to each portion of the road is subject to the general laws of the State in which it lies, and subject to repeal, c., if the legislature of that State has such power. Philadelphia Wilmington Railroad Co. v. Maryland, 10 How. U.S. 376; The Delaware Railroad Tax, 18 Wall. 206; Stateof Ohio v. Sherman, 22 Ohio St. 411; and for other cases, in some of which the courts held the intention was to create a new corporation, see State v. Maine Central Railroad Company,66 Me. 488, 497, 510; Clearwater v. Meredith, 1 Wall. 25, 40;Bishop v. Brainerd, 28 Conn. 289, 299; Platt v. New York Boston Railroad Co. 26 Conn. 544; McMahan v. Morrison,16 Ind. 172; Hamilton Mutual Insurance Company v. Hobart, 2 Gray, 543; Commonwealth v. Atlantic Great Western Railway,
3 Pa. St. 9.
In Ohio Mississippi Railroad Co. v. Wheeler, 1 Black. 286, 297, Taney, C.J., in delivering the opinion of the court, says it is true the corporation had been chartered by both States, and is spoken of in their laws as one corporate body. "Yet it has no legal existence in either State except by the law of the State, and neither State could confer on it corporate existence in the other, *Page 275 
nor add to or diminish the powers to be there exercised. It may, indeed, be composed of and represent under the corporate name the same natural persons. But the legal entity or person which exists by force of law can have no existence beyond the limits of the state or sovereignty which brings it into life, and endues it with its faculties and powers." The declaration in that case had described the plaintiff as a corporation created by two States. It was held that it was a distinct and separate corporate body in each State, and they could not join in suing.
It was said in the respondent's argument that the Connecticut charter of the Boston, Hartford, and Erie Railroad Co. in A.D. 1863, by sections two and four, gave that company power to purchase, contract with, lease or take leases of, or make joint stock with any portion of the contemplated road from Boston to the Hudson River. True, it did as to the Boston, Hartford, and Erie Railroad Company, but as before said, it could have no effect on any railroad property in the jurisdiction of another State, i.e. it could not authorize the Hartford, Providence, and Fishkill Railroad Company to dispose of their railroad in Rhode Island without the consent of the Legislature of Rhode Island, and then the power would be derived from Rhode Island and not from Connecticut.
The respondents have referred us to a decision in New York,In the Matter of the Prospect Park Coney Island RailroadCompany, 67 N.Y. 371, 377, holding that where two corporations wish to unite, it is enough if the charter of one of them contains a power to unite, as it cannot unite unless it can find some other corporation willing to unite, and if it does, the other company gets power to unite from the charter of the one which contains it. If such a decision was made it is certainly a strange one, but not stranger than another made in the same State in Gould v. Hudson River Railroad Co. 6 N.Y. 522. It has generally been regarded as sound law that the stockholders invested their property upon the faith of what was contained in their own charter and were not bound to look to any other, unless referred to in their own, and that a majority could bind a minority only when their own charter allowed or contemplated it.
It is argued by the respondent that the legislature having the *Page 276 
right to alter, amend, or repeal, have a right to unite corporations, to compel a union even without the consent of the stockholders. This is a very broad proposition, of which, if adopted, the consequences could not be foreseen. It is to be presumed the legislature would always have a proper regard for the preservation of the public faith, and for the rights of property of those who had invested in reliance upon their charter. And if the alteration was such as in effect to make a new corporation, it might be a question whether in Rhode Island it would not fall within the spirit if not the letter of the provision of our Constitution hereafter referred to requiring notice to be given before the legislature can do it. Zabriskie
v. The Hackensack New York Railroad Company, 18 N.J. Eq. 178.
In the present case it is not disputed that the Providence and Plainfield Railroad Company was chartered with a view to a continuation westward.
What powers did the Hartford, Providence, and Fishkill Railroad Company have to unite, lease, or consolidate, apart from legislative action?
In the old Providence and Plainfield Railroad Company's charter it was provided by section 16 that it might unite with any other road continuing westward. They did unite with the Hartford, Providence, and Fishkill Railroad Company, and this power was thus exercised and exhausted. It can hardly be seriously argued that this power of union was to continue forever.
It would be as sensible to argue that when a lease with covenants contains a covenant for renewal, the new lease must contain a covenant for renewal, and so on in perpetuum.
The power had accomplished its object. The Providence and Plainfield Railroad Company had united with the Hartford, Providence, and Fishkill Railroad Company leading westward. And the Act of January, A.D. 1852, cannot be construed to give further powers of union. There was no need that all the roads should form one corporation. By the twenty-first section of the Providence and Plainfield Railroad Company's charter the company was authorized, in lieu of uniting, to lease or take a lease,c. It is enough to say that this power was only to be exercised in case the other was not, and the power to unite having been used the other alternative grant of course fails. *Page 277 
And the power to lease must receive a reasonable construction. While a sale was evidently illegal, it seems plain that the corporation cannot accomplish indirectly what they cannot do directly. A lease for nine hundred and ninety-nine years is practically a sale. It is an evasion of the law. It would seem looking a great way ahead to provide, as they have done, for a renewal of such a lease.
They have also provided that the Boston, Hartford, and Erie Railroad Company may use the name of the Hartford, Providence, and Fishkill Railroad Company to condemn lands. This cannot be considered as anything less than a breach of trust on the part of the Hartford, Providence, and Fishkill Railroad Company.
We are therefore all of opinion that the contract, deed, and lease were ultra vires and void.
If then the contract and lease and deed so made were beyond the power of the corporations to make, what was the effect of the ratification by the legislature by its Act of March 2, at the January Session, A.D. 1865.
While the lease was of the railroad and property, the deed executed at the same time purports to convey the railroad franchise, c., and purports to be executed by authority of the States of Rhode Island and Connecticut. Whether material or not, it may be noticed that the ratification is not of the agreement nor of the lease, but of the sale or deed.
Have the legislature the power to confer on a foreign corporation the right of eminent domain?
The right of eminent domain is a portion of the sovereign power of the State. In the theory of the older English law writers, and some American, it is founded on the idea that the government was the original proprietor of the soil, and granted it to the subject reserving the right of resuming it if required for the public use. Such a theory has no foundation in the settlement of this State. Our ancestors claimed title to the soil from the native Indians, and looked to the king only for a charter of government, and that rather as confirming what they themselves had previously done. Very little of the soil in Rhode Island is held under grants from the State. *Page 278 
But upon whatever theory originally founded, the law is well settled. The right exists in the government to take private property for public use, in cases where necessity requires it, and the legislature is ordinarily the judge of that necessity. It is an enormous arbitrary power to seize the property of the citizen without or against his will, and apply it to public uses. But it must be for the public use, and for the use of the people of this State. The legislature of this State cannot seize and condemn the land of its people for the good of the people of Connecticut, nor indeed for the good of the nation. If needed for the purposes of the General Government, that government must act for itself. And the right to hold the property when taken is just as much an exercise of the power of eminent domain as the original taking is.
As this power can only be exercised by agency or delegation, it has been delegated to domestic corporations. But it is only because the corporations undertake to perform duties to the public, not for the private benefit of stockholders. The latter may be incidental, but cannot be the ground of the grant. And these public duties they may be compelled to perform. The grant is a public trust for the abuse of which they may be held responsible. In many cases legislatures have bound themselves not to grant similar privileges to others, thus increasing the value of the grant as private property, and depriving other portions of territory of similar privileges.
And there is a wide difference between granting this enormous power to a foreign or domestic corporation. In the latter case, if the power was abused, the legislature itself can in many cases regulate or revoke the power by altering, amending, or repealing the charter. The legislature has full control, and in all cases could regulate the exercise of the power, and prevent its abuse by general laws for the public good. But in case of a grant to a foreign corporation, it might be claimed to be such a grant or compact as is beyond the control of the legislature. And for breaches of contract and damages it might do to the business or lives of our citizens, the remedy would be seriously obstructed.
The State of Connecticut, by a statute of July, 1869, to which the respondents refer, has given to railroad corporations very large *Page 279 
powers of contract and leasing. New York, by an Act of May 20, 1869, quoted in one of the cases cited by the respondents, has given to such corporations very large powers as to consolidating with the roads of other States. To powers of consolidation there is not the same objection, as according to the decisions of the courts the corporation still remains a corporation in each State. In some western States laws have been passed authorizing the sales of roads to corporations of other States.
The importance of the question, i.e. the power to grant this portion of sovereignty to a foreign corporation, leads to an examination of the reported cases. In the treatises on the subject we are referred to but few cases. The Matter ofTownsend, 39 N.Y. 171; Morris Canal Banking Company v.Townsend, 24 Barb. S.C. 658; New York Erie Railroad Company
v. Young, 33 Pa. St. 175. In these cases the right claimed seems to be assumed, as we might naturally suppose it would be from the nature of the legislation of these States. But the question was not seriously argued or discussed by counsel or court.
There is an apparent recognition of the power in RailroadCompany v. Harris, 12 Wall. 65, 82. The question was whether acts authorizing the continuance of a railroad into another state or district operated merely as a permission, or as creating a new corporation, and the only question in the case was as to how the corporation should be sued. The court in their opinion do indeed say, "Nor do we see any reason why one State may not make a corporation of another State, as there organized and conducted, a corporation of its own, quoad hoc any property within its territorial jurisdiction. That this may be done was distinctly held in The Ohio Mississippi Railroad Company v. Wheeler, 1 Black. 286, 297. It is well settled that corporations of one State may exercise their faculties in another, so far, and on such terms, and to such extent, as may be permitted by the latter. We hold that the case before us is within this latter category."
So far as the first paragraph of this is concerned, the making it a corporation within this State, that is disposed of here by our Constitution, which provides that it can only be done after public notice. And so far as concerns the latter paragraph, it is undisputed law, if confined to the cases in which it has been decided, *Page 280 
and which Judge Swayne cites as authorities. The only cases he refers to are Blackstone Manufacturing Company v. Inhabitantsof Blackstone, 13 Gray, 489, which related to taxing in Massachusetts property belonging to a Rhode Island corporation; and Bank of Augusta v. Earle, 13 Pet. 519, 588, where the question was whether a bank chartered by one State could purchase bills of exchange without that State.
In neither of these two cases could the question of the right of eminent domain arise. And in Railroad Company v. Harris,
12 Wall. 65, the only question was how the suit should be brought, and the court do not seem to have considered the relation of the question to the right of eminent domain as a portion of the sovereignty of the State at all. The latter right would by no means follow from the mere general power to make ordinary business contracts. There was formerly a great conflict of opinion as to whether a corporation could in any case act extra-territorially, or could be acknowledged to have any existence out of the State which created it; and many of the cases have turned on this point, and have related to banks and business corporations exercising no power of eminent domain; and a great number of the cases in the United States courts have turned upon the point of the citizenship of a corporation, and in what State it could sue in the federal courts.
And so far as relates to railroad corporations acting extra-territorially in making certain classes of contracts, it may be considered as settled by previous decisions affecting corporations generally: but to hold that it extends to authorize a corporation to sell its right of eminent domain, or that a legislature may delegate the right of eminent domain to foreigners, or ratify it when attempted to be done by others, is a very different matter. If this is a specimen of what is called legal logic, the less of it the better.
But a doubt may be suggested from the fact that it is laid down in some works that the right of eminent domain may be granted to an individual, and if granted to him while resident, and he remove from the State, that this would be inconsistent with the view I have taken.
When our Constitution was formed no one probably dreamed *Page 281 
that it would ever be claimed that a State could grant to an individual this enormous power to take the land of others. The idea has evidently come from an extension of the principle of our old flowage laws. Even the mill acts which were passed in early times, when grist-mills and saw-mills were matters of necessity, and land almost worthless, and which were afterwards extended to mills for manufacturing cotton, c., were only defended originally on the ground that they did not authorize the taking of another's land, but only the raising of one's dam on his own land, and that the flowing was only an easement causing consequential damage; and courts have many times intimated that if the question was a new one they might not be sustained. But these laws have stood too long, and too much property has been invested on the faith of them, to be now questioned. But no legislature, so far as I know, ever went the length of authorizing one man to take another's land for the purpose of building a mill upon it, except the Assembly of North Carolina, which by the Act of A.D. 1777, cap. 23, authorized land to be taken for grist-mills, but declared the mill when erected to be a public mill; and the Supreme Court of Tennessee, in Harding v.Goodlett, 3 Yerg. 41, refused to extend it to a paper-mill. Such an act passed in a semi civilized state of society can hardly be a safe precedent.
Mills on Eminent Domain, the latest treatise, does indeed state that a legislature may grant this power to an individual, and he cites certain cases as sustaining this doctrine. Let us examine them. In Crittenden v. Wilson, 5 Cow. 165, an act had authorized a man to build a dam on his own land which might obstruct a navigable creek and also flow the land of others. This is in principle the same as our mill acts.
Boston Water Power Company v. Boston Worcester RailroadCompany, 23 Pick. 360. The legislature had granted to one corporation power to take certain property previously granted to another. What this has to do with the present case would require pretty sharp eyes to see.
Beckman v. The Saratoga Schenectady Railroad Company, 3 Paige, 45, was a case of grant to build a railroad to Saratoga. It was contended that the grant was for the benefit of a particular village, and not for the benefit of the public generally. But *Page 282 
the grant was to a domestic corporation; and although Chancellor Walworth does say, p. 73, that it might be done by private enterprise, yet this was not in question, and he cites no case nor instance whatever to support his dictum. He did indeed quote himself in Bloodgood v. The Mohawk Hudson RailroadCompany, 18 Wend. 9, 13. But both were cases of corporations, and not of individuals.
In the Matter of Kerr, 42 Barb. S.C. 119. This was a case where the New York Legislature had given to certain persons or their assigns the right to make a street railroad in New York city, and to cross other such railroads. To understand this case it is important to know that in New York city the fee of the streets is in the public, and that here no taking of private land was in question. While holding that the franchise of a corporation may be taken for public use, and for this he cites several decisions, it being admitted law, the judge says he can see no reason why the right of eminent domain cannot be delegated to individuals if it can be to corporations, but cites no authority, nor does it appear that the question was considered. The decision might well be based on the general power of the State over its highways.
The Buffalo New York City Railroad Company v. Brainard,9 N.Y. 100, decides that the legislature had power to authorize the formation of railroad corporations by general law. There is not a word in the opinion of the court about conferring it on individuals.
North Missouri Railroad Company v. Gott, 25 Mo. 540. In Missouri there was a general railroad law for the formation of railroad corporations. The plaintiffs had a charter, and the question was as to the validity of proceedings under one or the other.
The Tide Water Canal Company v. Archer, 9 Gill J. 479. In this case the land had been taken by a corporation under an act of the Legislature of Maryland. The court in giving their opinion, p. 483, do say that it is "equally well settled now and certainly in this State that this right may be exercised for the benefit of the public by individuals or by corporations." But the question was not at issue, nor before the court, nor argued there. *Page 283 
 State v. Boston, Concord Montreal Railroad Company,25 Vt. 433. I cannot agree with my brethren in considering that the decision in this case has any bearing of any consequence upon the case now before us. The defendants, a corporation created by New Hampshire, had made a bridge and purchased lands in Vermont, claiming to hold them in fee, and quo warranto was applied for against them. The question was whether aliens, and especially a foreign corporation, could hold lands in Vermont. It appeared that defendant corporation were building a railroad in New Hampshire to the line of Vermont, for the purpose of uniting with two Vermont roads which had express permission in their Vermont charters to unite with the New Hampshire road. The land they bought was almost indispensable, the court say, to their business if they should so unite. And the sole question was, not whether they could build, or hold, or operate a railroad in Vermont, but whether they could hold this land in fee. Judge Redfield, after saying that all the functions of a corporation are in one sense franchises, e.g. the right to hold property, to sue and be sued, to contract, c., are franchises, and must be recognized wherever the existence of the corporation is for any purpose recognized, continues: "But the right to build and run a railroad and take toll or fares is a franchise of the prerogative character, which no person can legally exercise without some especial grant of the legislature. And we should not of course be expected to suffer a foreign railroad to usurp the exercise of any franchises of this character." They would have "a right to build their road to the very line of the State, if they could obtain the land for that purpose, without coercive measures. They could not perhaps compel the land-owners to yield the right of way . . . without a grant from the legislature of the prerogative power to exercise the right of eminent domain over lands in this State." pp. 442, 443. And the court held there was nothing to justify the issuing of the writ of quo warranto, as the defendants merely held the land the same as any other proprietor would.
Now a decision upon this point by the Supreme Court of Vermont, more especially at the time when Judge Redfield presided over it, would be entitled to the highest respect. But it does not appear that the point made in our own case was discussed before *Page 284 
the court, and what is said in the opinion is only by implication, and the grant of power intended by the court might have been to consolidated or united corporations. And it does not even by implication affect the question of granting the power to a private individual.
In Bank of Middlebury v. Edgerton et als. 30 Vt. 182, in which case the railroad had been leased to an individual for three years, Bennet, J., says, p. 190: "The right to build, own, manage, and run a railroad, and take tolls thereon, is not of necessity of a corporate character or dependent upon corporate rights. It may belong to and be enjoyed by natural persons, and there is nothing in its nature inconsistent with its being assignable. See Peter v. Kendall, 6 B. C. 703; Comyns' Digest, title Grant C."
Now let us look at these authorities. Comyns mentions among things which may be granted, a franchise, such as a market or a fair, and he mentions no other. Peter v. Kendall related to a ferry grant, which of course may be granted to an individual.
And the case of the grant by the State of New York to Fulton and Livingston of an exclusive steamboat privilege was a monopoly, excluding others from interfering with them in navigation, but no power of eminent domain or taking anybody's property was granted to them. Gibbons v. Ogden, 9 Wheat. 1.
In Young v. Buckingham, 5 Ohio, 485, the Legislature of Ohio had granted to one Dillon and his associates power to erect a toll-bridge, and to take land, c. Evidence was offered that before the bridge was erected a public highway was laid out, and the bridge was erected on it. This evidence was rejected, and, as the Supreme Court held, improperly. The bridge had stood as it was about twenty years before the plaintiff brought his suit. The question of the right to grant to individuals does not seem to have been raised. It may have been assumed, and there is nothing to show that the decision was not influenced by the other facts in the case e.g. it being actually built upon a highway.
To say that these cases establish the right of a legislature to delegate a portion of the sovereignty of the State to a private person seems to assume too much, when it does not appear that the question was made or discussed in any of them.
Like mills, toll-bridges in fact make a class by themselves. *Page 285 
So far as concerns navigable rivers, the legislature has full power to regulate them. And as to the land on which the terminal abutment rests, the public have already acquired an easement, and it is only a question of additional burden, if burden it can be called.
So with ferries where no one's land is taken, but the privilege consists in excluding others from the right of carrying passengers. In the course of time the privilege and wharf may become separated from the upland.
It was going far enough to hold that this power of eminent domain might be granted to corporations. It will be seen from these cases that the authority to grant it to individuals does not rest on any very good foundation. Because the legislature may grant certain franchises to individuals, it does not follow by any analogy or sound reasoning that they should grant to one man the right to take another's property.
And there is a reason for the distinction between a corporation and a natural person. The State has no control over the latter; he may go away, and the grant to him may be construed by other courts to be a compact irrevocable under the Constitution of the United States; while a corporation chartered by the State cannot go out of it, and is always under the control of the legislature.
The logical outcome of many of the decisions and dicta on this subject of sacrificing private rights to a very slight public advantage is communism, and this it is to be presumed the legislature never intended. A man may for his own pleasure leave a space between his house and the highway for trees and flowers; a poorer neighbor might raise a good crop of corn and potatoes on it. The private benefit to the poor neighbor would be great, and the public benefit would also be great in supporting a family, encouraging the growth of population, and so strengthening the national power. Why should not the State grant him the right to do it on paying a rent to be fixed by state commissioners?
But there is another consideration. Our Constitution wisely requires that every petition to the legislature for a charter for a business corporation shall be continued over until after a new *Page 286 
election of members, and that public notice of its pendency shall be given as may be required by law; and our statute, Gen. Stat. R.I. cap. 18, § 2, requires that notice of the pendency of the bill and its purpose shall be given, c., c., for three weeks preceding the election. The manifest intent of this is to provide that, e.g. in case of taking land for public uses, seldom allowed except for a railroad, persons whose lands or interests are to be affected should have an opportunity to appear before the legislature and see that their rights were properly protected. When this statute was first enacted no one dreamed of a private individual building a railroad.
In Massachusetts, the notice, although provided for by statute only, and not by the Constitution, is required to be very particular, and by their present practice plats are required to be presented, so that when the act is passed the condemnation is really made by the legislature itself.
The provision in the Constitution was, as I have said, intended to prevent grants of great privileges being passed through the General Assembly without giving the people an opportunity to express their opinions. But if the legislature could grant them without notice to a foreign corporation already chartered, this object would be entirely defeated. By going into a neighboring State and procuring a charter, our own citizens might evade it. As I have said, the power to hold a road already made is just as much an exercise of the right of eminent domain as the original taking. And if they could grant power to hold it they could grant power to take it.
And could the Constitution intend that the legislature might grant to a foreign corporation, by ratification of a sale or otherwise, these great powers without notice, when they could not do it to our own citizens at home? It is true that in the present case a certain notice was given, but if the legislature had power to ratify a sale no notice was necessary.
I feel obliged, therefore, to conclude, dissenting in this from the majority of the court, that upon all sound principles the legislature had no power to ratify the sale in the manner they did. It was against the spirit, if not against the letter, of the Constitution. If it was a sale to a foreign corporation, would it not be *Page 287 
introducing a new corporation into this State? It does not merely authorize it to make ordinary contracts, or have agencies here, but gives it a permanent home here. If so, it should be held void for the reasons before stated.
Can it be considered a consolidation, like some others we have in the State? If so, it would still remain a corporation in each state, upon the decisions I have quoted. They might, like the old Blackstone Canal Company, have the same stockholders, and retain an entirely separate organization in each State, or if united as one company, could act in each State only as a corporation of that State. But it is difficult to construe a sale into such a consolidation as the courts intend when they use that word.
Did the Rhode Island Legislature intend by the ratifying act to make it a Rhode Island corporation? If so, as it was not a corporation here before, it would be a new corporation within this State, and the legislature would not have the power to create it without the constitutional and statutory notice. We are told by the respondents that notice was given, but on referring to the manuscript records of the State for the January Session, A.D. 1865, we find the notice given was of a petition to confirm a sale, and not of a petition to create a Rhode Island corporation. The petitioners were evidently acting under the idea that the sale would be valid, and that they did not need a Rhode Island charter. And it is significant that the Boston, Hartford, and Erie Railroad Company styles itself a Connecticut corporation, in an act passed in A.D. 1869, four years after this ratification, and quoted in the respondents' brief. And the Boston, Hartford, and Erie Railroad Company was dissolved by a decree of the Connecticut courts in A.D. 1873. The parties evidently then considered it as only a Connecticut corporation, as it does not appear that they ever applied to have it dissolved in Rhode Island. In the very act of ratification by Rhode Island, it is described as a Connecticut corporation, and is nowhere spoken of as a Rhode Island corporation; and if the parties themselves had intended to make it, or had looked upon it as such, they would not have reserved in the contract the right to use the name of the old corporation.
It is, indeed, made subject to Rhode Island laws. So far as it could be reached, it would have been so any how. But if a Rhode *Page 288 
Island corporation, it would have been subject to the power of the Rhode Island Legislature to alter or amend, but not if it remained only a Connecticut corporation. And those who drafted it, being residents of another State, may have intended that it should. Does the making it subject to the liabilities of the old company make it liable to repeal or amendment by the Rhode Island Legislature? Our court may so hold. But it is a grant; and other courts may construe it to be a contract irrepealable and unalterable. It would have been very easy to have made this matter plain if the parties meant so.
It is said that the court cannot restore things to where they were, and that it cannot restore them to a corporation, the Boston, Hartford, and Erie Railroad Company, which has been deprived of its existence by the power which created it. It may be well, then, to consider where they are, and whether any restoration is necessary.
The Boston, Hartford, and Erie Railroad Company as a Connecticut corporation, has indeed been dissolved in Connecticut, but the Hartford, Providence, and Fishkill Railroad Company is still alive as a corporation, at least in Rhode Island. Its charter has never been, so far as we are informed, repealed or declared forfeited. If it had been, the land over which they held the easement would have reverted to the former owners. It is only by that charter, or by succession to it, that that corporation, or any other, can hold it. The stockholders may all be foreigners, but the corporation must be a Rhode Island corporation. The very agreement now in controversy evidently contemplated that the Hartford, Providence, and Fishkill Railroad Company's charter would continue to exist for ages, or the agreement would not have bound it to renew the lease at the end of nine hundred and ninety-nine years.
The Boston, Hartford, and Erie Railroad Company claim, by virtue of several assignments, to be the holder of the largest portion of the Hartford, Providence, and Fishkill Railroad Company's stock. This stock, as I understand, was never conveyed to the Boston, Hartford, and Erie Railroad Company, but to Bartholomew as trustee, and was conveyed by the assignees in bankruptcy to the New York and New England Railroad Company, *Page 289 
and under a decree of court delivered to them by said Bartholomew.
If they have obtained control of a majority of the stock, this court has no power to prevent their using the power it gives them, so long as they proceed according to their charter and the laws, and with a proper regard for the rights of the minority.
But it is claimed by the respondent, the New York and New England Railroad Company, that the Hartford, Providence, and Fishkill Railroad having been sold to the Boston, Hartford, and Erie Railroad Company, and the Boston, Hartford, and Erie Railroad having been sold to them, they are the owners of the road, bona fide purchasers for value and without notice, clothed with the legal title, and so consequently entitled to redeem, and that being so they are not affected by any equities between the Boston, Hartford, and Erie Railroad Company and the former owners. If they are entitled to redeem, then the Hartford, Providence, and Fishkill Railroad Company is not.
It is necessary, therefore, to examine the Berdell mortgage so called.
The Boston, Hartford, and Erie Railroad corporation being, in my view, a Connecticut corporation only, by deed of March 19, 1866, conveyed among other things its railroad in Rhode Island, between Providence and Willimantic, to Berdell and others, trustees, to secure an issue of bonds to the amount of $20,000,000. In the preamble it is described as a corporation existing under the laws of Rhode Island, c. Among other extraordinary provisions, it contains one very remarkable. By section 10 the bondholders on taking possession may organize themselves into a corporation, choose directors and officers, fix a corporate name, c., and the mortgage undertakes to invest this corporation so formed with all the franchises and powers of the Boston, Hartford, and Erie Railroad Company.
Whether they had power to make such a voluntary corporation for railroad purposes in Massachusetts or Connecticut, is not for the courts of this State to decide.
For certain purpose the power of voluntary incorporation has existed in Rhode Island since January, A.D. 1839; but not as to railroads. And so far as creating a Rhode Island corporation is *Page 290 
concerned, this provision must be considered as utterly void, so far as the mortgage could give any such power. One corporation cannot give authority to anybody to create another corporation, at least by the laws of this State.
But it is said this mortgage was ratified and confirmed by the Legislature of Rhode Island at its January Session, A.D. 1866. It is enough at present to say that so far as the mortgage pretended to give the bondholders power to form a new corporation in Rhode Island the legislature could not delegate to others, by ratification or otherwise, one of the most important powers of legislation; and more, they could not delegate a power they did not possess themselves, i.e. a power to create such a corporation otherwise than as prescribed in the Constitution.
Under this provision, however, the bondholders did undertake to form a new corporation to which they gave the name of the New York and New England Railroad Company.
I call it a new corporation, for it would be difficult to say what is a new corporation if this is not. There is not only a new name, but a new stock created. The stockholders are in no sense, as it seems to me, successors of the old. And there is a new capital, and I think of a different amount.
If the legislature had provided by a general law in force before these transactions took place that when mortgagees took possession of a road, and the right of redemption was gone, they might apportion the old stock among themselves, and go on with all the rights, privileges, duties, and liabilities of the old corporation, there would be some ground for holding one to be the successor of the other. All stockholders in the mortgagor corporation then would have held subject to the law, and on the understanding that upon a foreclosure their stock passed to the mortgagees.
At the May Session, A.D. 1873, the Legislature of Rhode Island passed an act by which the New York and New England Railroad Company "is hereby recognized and declared to be a corporation invested with all the powers, privileges, and franchises, c., and subject to all the duties, c., of said Boston, Hartford, and Erie Railroad Company," and the proceedings in forming said corporation are ratified and confirmed.
It is difficult to see how an act of the Legislature of Rhode Island *Page 291 
and could validate the formation of a Connecticut or Massachusetts corporation, or could invest the new corporation with the franchises of a Connecticut corporation; and as I have said the Boston, Hartford, and Erie Railroad Company, in my view, never had a corporate existence in Rhode Island.
But there is still another difficulty: if the act merely means to recognize the New York and New England Railroad Company, as a Connecticut corporation, there was no need of it. If it intended to make it a Rhode Island corporation, which it certainly was not before, then a Rhode Island corporation cannot constitutionally be created in that mode. And for the same reason before given in regard to the Boston, Hartford, and Erie Railroad Company, the New York and New England Railroad Company has no legal existence as a Rhode Island corporation. The notice given was only of a petition praying for an act concerning the New York and New England Railroad Company, and to confirm the transfer by the trustees. But it is to be noticed that whatever effect this ratification might have had otherwise, it contained an express reservation of the rights of other persons and corporations, and the New York and New England Railroad Company accepted it with this qualification.
In the suit for foreclosure in Rhode Island under the Berdell mortgage, Ellis et al. v. The Boston, Hartford Erie RailroadCompany et als., Equity, No. 991, at the March Term, A.D. 1875, the Hartford, Providence, and Fishkill Railroad Company was not a party. Of course they are not bound by the decree of foreclosure made in that suit, June 30, 1875. But further, the rights of the stockholders of the Hartford, Providence, and Fishkill Railroad Company, and of all persons and corporations not parties to the suit, are expressly reserved. The deed from the assignees contained still broader notices. Thus at its formation the New York and New England Railroad Company had notice of the existence of other claims.
In the suits in equity in the United States Circuit Court to redeem the mortgages there, the Hartford, Providence, and Fishkill Railroad Company were indeed made parties. But that suit related only to the Connecticut portion of the road as stated by the respondents in their answer. *Page 292 
It is true the complainants in their bill designate the New York and New England Railroad Company as a Rhode Island corporation. But when the parties and the facts all are before us, the court is bound to know and to apply to the case the provisions of our Constitution and laws.
So far as concerns the point made by the complainant that the agreement of August, A.D. 1863, was without consideration, it cannot affect the validity of sales of stock voluntarily made by a portion of the stockholders for a price they chose to take.
As concerns the charges of fraud in the subscription to the stock of the Boston, Hartford, and Erie Railroad Company, we all agree that none is shown satisfactorily. And it is evident that the statement that the expenses of completing the railroad would not exceed $1,000,000 was an estimate only; if an agreement, we cannot consider it as a condition.
On the view I have taken the questions of laches and of the statute of limitations become unimportant.
My conclusion would be that the Hartford, Providence, and Fishkill Railroad Company is still in existence as a legal Rhode Island corporation, and entitled to the possession of the road on redeeming the Rhode Island mortgage and so much of the Berdell mortgage as might belong to them to redeem, if any, and any other debts or claims which by subrogation or otherwise the New York and New England Railroad Company may equitably hold against said road, or for any expenditures of money upon it. Whether the holders of the Berdell bonds who did not convert them into New York and New England Railroad Company stock were bound by the acts of their trustees in conveying to the new corporation, I express no opinion.
Decree entered March 12, 1881, dismissing the bill withoutcosts.